*U.S. Department of Justice*

*United States Attorney
Southern District of New York*

*The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007*

December 11, 2019

**BY ECF**

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

  Re: *United States v. Lev Parnas*, 19 Cr. 725 (JPO)

Dear Judge Oetken:

  The Government respectfully writes in opposition to defendant Lev Parnas's letter motion dated December 4, 2019 seeking a "modification of the terms of his pre-trial release, to allow him to leave his home daily from 8:00 am to 5:00 pm, provided that he avoids airports, boat docks or train terminals" (Dkt. 41). For the reasons set forth herein, the Government opposes Parnas's request, and further asks the Court to revoke Parnas's bail and remand him pending trial. It does so upon learning, in the course of preparing its response to Parnas's motion, that: (i) Parnas made materially misleading and false statements to Pretrial Services and the Government regarding his assets and income; and (ii) Parnas misled his supervising Pretrial Services officer in the Southern District of Florida regarding whether the Court had already approved of Parnas's requested bail modification. Parnas poses an extreme risk of flight, and that risk of flight is only compounded by his continued and troubling misrepresentations to the Pretrial Services office and the Government. Parnas's actions in the two months that he has been released, coupled with his substantial risk of flight, have shown that there is no set of conditions that will reasonably ensure his appearance and compliance with the terms of his release. Accordingly, the Government moves to revoke Parnas's bail and seeks his remand pending trial.

## BACKGROUND

**1. The Charges**

  On October 10, 2019, an indictment (the "Indictment") was unsealed, charging (i) defendants Lev Parnas, Igor Fruman, David Correia, and Andrey Kukushkin with conspiring to violate the ban on foreign donations and contributions in connection with federal and state elections, in violation of 18 U.S.C. § 371 and 52 U.S.C. §§ 30121, 30122, and 30109 (the "Foreign Donor Scheme"); and (ii) Parnas and Fruman with conspiring to make contributions in connection with federal elections in the names of others, in violation of 18 U.S.C. § 371 and 52 U.S.C. §§ 30122 and 30109; and with making false statements to and falsifying records to obstruct the

December 11, 2019
Page 2

administration of a matter within the jurisdiction of the Federal Election Commission ("FEC"), in violation of 18 U.S.C. §§ 1001 and 1519 (the "Straw Donor Scheme"). (Dkt. 1).

With respect to the Foreign Donor Scheme, the Indictment alleges, in sum, that the defendants formed a recreational retail marijuana business that would be funded by a Russian national ("Foreign National-1"), and conspired to use Foreign National-1 as a source of funding for donations and contributions to state and federal candidates and politicians in Nevada, New York, and other states to facilitate acquisitions of recreational retail marijuana licenses. With respect to the Straw Donor Scheme, the Indictment alleges that in or about May 2018, Parnas and Fruman made a $325,000 contribution to an independent expenditure committee ("Committee-1") and a $15,000 contribution to a second independent expenditure committee, and falsely reported that both contributions came from Global Energy Producers ("GEP"), a purported liquefied natural gas import-export business that they incorporated around the time the contributions were made, at least in part for the purpose of masking the source of the contributions. In or about May and June 2018, Parnas and Fruman committed to raise $20,000 or more for a then-sitting U.S. Congressman ("Congressman-1"), which pledge they later satisfied in part by using funds from Fruman to unlawfully make two maximum $2,700 contributions in Parnas's and Fruman's names. Parnas also met with Congressman-1 and sought Congressman-1's assistance in causing the U.S. Government to remove or recall the then-U.S. Ambassador to Ukraine (the "Ambassador"). Parnas's efforts to remove the Ambassador were conducted, at least in part, at the request of one or more Ukrainian government officials. Furthermore, in response to a complaint filed with the FEC regarding the $325,000 contribution to Committee-1, Parnas and Fruman submitted sworn affidavits that contained materially false statements suggesting that GEP was a "real business enterprise" that had legitimately funded the contribution. (Dkt. 1).

2. **Parnas's Arrest and Bail**

Parnas and Fruman were arrested on October 9, 2019 at Dulles International Airport in Virginia, as they were boarding the jet bridge for a flight bound for Vienna, Austria with one-way tickets that had been purchased the day before.[1] Parnas and Fruman were presented in the Eastern District of Virginia the following day, and both defendants consented to a bail package that included a $1,000,000 bond, to be fully secured by cash or property, and home incarceration with electronic monitoring, among other conditions. Parnas and Fruman were ordered to be detained until all conditions were met.[2]

However, Parnas subsequently represented to the Government that he was unable to meet the conditions of his release because he did not have sufficient cash or any property to secure the $1,000,000 bond. On October 17, 2019, in support of his request to reduce the bond security amount to $200,000 in cash, Parnas's counsel told the Government that the following were the

---

[1] As the Court is aware, at the time they were leaving the country, Parnas and Fruman had received Congressional document requests dated September 30, 2019, and on October 8, 2019, Parnas and Fruman, through counsel, had refused to cooperate with the Congressional requests.

[2] Fruman and Kukushkin—who also have international ties and access to foreign funding—both consented to bail packages including a fully secured $1,000,000 bond and home detention with GPS monitoring. (*See* Dkt. 12, 13 (Kukushkin); 23, 24 (Fruman)). Following a November 1, 2019 bail hearing, the Court denied Fruman's request to remove GPS monitoring, after determining that Fruman posed a risk of flight. (*See* Dkt. 37).

December 11, 2019
Page 3

"current cash accounts possessed by the Parnas'[s]": (i) a bank account held in the name of Parnas's wife, Svetlana Parnas, with a balance of approximately $450,000 ("Account-1"); (ii) a student checking account to which Svetlana Parnas was a signatory with a balance of less than $50; and (iii) a checking account held in the name of one of Parnas's businesses, to which Parnas was a signatory, with a balance of approximately $2,000. On this basis, the Government consented to the requested bail modification on October 18, 2019, with the additional condition that Parnas complete a financial affidavit under penalty of perjury (the "Affidavit"). Parnas met the modified bail conditions and was released on October 21, 2019. On October 23, 2019, Parnas appeared before Your Honor and the parties jointly proposed a substantially similar bail package, which the Court endorsed. That package included, in relevant part, a $1,000,000 personal recognizance bond secured by $200,000 in cash and co-signed by Aaron and Svetlana Parnas; home detention with GPS monitoring, surrender travel documents and make no new applications; along with additional restrictions on travel, among other conditions. (Dkt. 21, 22).

### 3. Parnas's Diverging Statements to Pretrial and the Government Regarding His Assets and Income

On October 15, 2019, a Probation officer in the Eastern District of Virginia interviewed Parnas in order to complete a Pretrial Services report.[3] When asked to describe his assets, Parnas claimed that he had approximately $8,000 in a checking account, $5,500 in cash, and $30,000 in two business accounts for a total of $43,500 in cash, and two vehicles. Parnas reported that he earned $30,000 annually from GEP, and $50,000 annually from a law firm (the "Law Firm") for his work as an interpreter. As discussed above, in an effort to reduce the amount of cash posted to secure his release, Parnas's counsel sent bank statements to the Government on October 17, 2019, which showed that the "Parnas'[s]," referring to Lev and Svetlana, possessed approximately $452,000, and thus could only afford to post $200,000 to secure Parnas's release; this sum was meaningfully different that the assets Parnas disclosed to Pretrial.

Parnas provided a different description of his assets to the Government in the Affidavit, which he signed under penalty of perjury: on October 29, 2019, Parnas represented that he owned GEP, but did not disclose his employment or *any* income from the Law Firm. When asked to list his assets, Parnas listed a sole business checking account with $644.37, and $5,000 cash on hand, along with approximately $30,000 in jewelry and two vehicles, but did not disclose any other accounts, property, income, or liabilities. As discussed below, the Government has now learned that none of these three descriptions of Parnas's assets and income—the October 15, 2019 Pretrial interview; the October 17, 2019 representation by Parnas's counsel to the Government; or the October 29, 2019 Affidavit—were consistent or fully accurate.

### 4. Parnas's Bail Modification Request

At the December 2, 2019 conference, Parnas's counsel asked the Court to modify the conditions of Parnas's release to allow him to leave the house during the day. The Government opposed that request, based on the significant risk of flight that Parnas posed and continues to pose. (*See* Dec. 2, 2019 Tr. at 32-33). The Court directed defense counsel to submit a letter in support of his request and note the position of Pretrial Services. (*Id.* at 34). On December 4, 2019,

---

[3] The Government did not receive this report, and was not aware of its contents until December 9, 2019.

December 11, 2019
Page 4

Parnas's counsel submitted a letter, which stated that he "had spoken with Mr. Parnas' United States Pre-Trial Services Officer in the Southern District of Florida, Rick Sam[]son, who does not oppose this request." (Dkt. 41 at 1).

The Government understands from Officer Samson that shortly after the December 2, 2019 conference, Parnas returned from New York and told Officer Samson, in sum and substance, that the "Judge wants us to get together to work out a deal to possibly give him some time out of the house" and that Parnas's counsel would call Officer Samson. Officer Samson also told the Government that in a subsequent phone conversation with one of Parnas's attorneys, the attorney told Officer Samson, in sum and substance, that the Judge "wants all parties to get together to work out a schedule to allow Parnas to leave his residence and engage in activities," specifically, "family activities." Officer Samson understood based on this conversation and from Parnas, in sum and substance, that the Court had already determined that the bail modification should be made, and that Samson was being consulted on the logistics (*i.e.*, which hours and for what activities Parnas could be allowed to leave the house). The Government has spoken with Parnas's attorney, who denied making any such statements to Officer Samson.[4]

On December 11, 2019, the Government conferred with both Officer Samson and Joshua Rothman, Pretrial Services Officer for the Southern District of New York. Officer Rothman has advised the Government that because Parnas has not incurred any violations (*i.e.*, unauthorized leave of the residence, misuse of time when approved to leave for specific activities, failure to properly maintain the equipment) since his release in October, Pretrial Services for the Southern District of New York is not seeking his detention. However, they request that Parnas's conditions be modified to address the risk of flight, to include increasing Parnas's supervision from home detention to home incarceration; that his attorneys be required to visit his home in person; and that Parnas's family be required to surrender their passports.

## DISCUSSION

1. **Applicable Law**

A defendant must be detained pending trial if the Government can show that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). A court does not need to find both bases are proven in order to order a defendant's detention. *See id.*; *United States v. Blanco*, 570 F. App'x 76, 78 (2d Cir. 2014). In considering the defendant's bail or detention, the Court must consider (1) the nature and circumstances of the offenses charged, (2) the weight of the evidence, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

---

[4] Counsel stated that he told Officer Samson that he was moving for a bail modification, that the Government opposed that modification, and that he was seeking Officer Samson's views. Counsel also stated that he sent Officer Samson a copy of his December 4, 2019 letter, and forwarded that email to the Government. The email reflects that counsel sent Officer Samson a copy of the letter after it had been filed.

December 11, 2019
Page 5

The Bail Reform Act provides that "[t]he [bail] hearing may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f)(2). Pursuant to 18 U.S.C. § 3148(b), as relevant here, the Court "shall enter an order of revocation and detention if, after a hearing, the judicial officer" (1) finds that there is "probable cause to believe that the person has committed a Federal, State, or local crime while on release" or "clear and convincing evidence that the person has violated any other condition of release"; and (2) finds that "there is no condition or combination of conditions of release that will ensure that the person will not flee" or "the person is unlikely to abide by any condition or combination of conditions of release." If the Court determines that there is probable cause that a person committed a crime on release, a "rebuttable presumption arises that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or to the community." *Id.*; *see also United States v. Gotti*, 794 F.2d 773, 777 (2d Cir. 1986) (probable cause requires "only that the facts available to the judicial officer 'warrant a man of reasonable caution in the belief' that the defendant has committed a crime while on bail" (internal citation omitted)).

### 2. Parnas's Bail Should be Revoked and He Should Be Remanded

Parnas's considerable ties abroad, seemingly limitless access to foreign funds, lack of candor with Pretrial Services about his assets, nature and circumstances of the offense, and powerful incentives to flee show that Parnas is a significant flight risk. His efforts to mislead Pretrial Services and the Government regarding his assets and income in an effort to gain his release—when coupled with his most recent effort to mislead Pretrial Services regarding the conditions of his release—only serve to compound the already-extreme flight risk that he poses. The Court should reopen the bail determination pursuant to 18 U.S.C. § 3142(f)(2) based on the new information that was not known or available to the Government at the time bail was set. Moreover, because each of the requirements of 18 U.S.C. § 3148(b) are met, the Court should enter an order of revocation and detention.

### A. Parnas Has the Connections and Means to Flee

Parnas poses a significant risk of flight for several reasons, the chief among which are his considerable ties abroad and access to seemingly limitless sources of foreign funding. Parnas has extensive and significant international ties, particularly in Ukraine, the country of his birth. Over the past two years, Parnas traveled repeatedly to Ukraine, and met with numerous Ukrainian government officials, including officials at the very highest level of government. More broadly, Parnas has traveled abroad more than twenty times over the past four years, including on a nearly monthly basis in 2019. Parnas took circuitous travel routes that obscured his final destination, such as by departing the U.S. for one country, but returning from a different country on a different airline. Parnas traveled internationally by private jet as recently as this year; bank account records from Account-1 show that Parnas spent more than $70,000 on private air travel in September 2019 alone. It also bears noting that Parnas could easily flee the country from the Southern District of Florida, where Parnas resides: the District is home to at least five international airports, numerous private airports, and international marine terminals. It would not be difficult for Parnas to leave the United States and live abroad: he also speaks fluent Russian, appears to own no property within the United States aside from two vehicles, and his wife and children could flee with him.

In addition, Parnas's close ties abroad include connections to Russian and Ukrainian nationals of nearly limitless means, including Foreign National-1 and a Ukrainian oligarch living in Vienna who is currently fighting extradition to this country. Parnas has proven adept at gaining access to foreign funding: in the last three years, Parnas received in excess of $1.5 million from Ukrainian and Russian sources. In sum, given Parnas's significant, high-level connections to powerful and wealthy Ukrainians and at least one Russian national, he could quickly and easily flee the United States for Ukraine or another foreign country, and recoup the security posted to his bond. It is difficult to overstate the extreme flight risk that Parnas poses.

### B. Parnas Has Powerful Incentives to Flee

Parnas has powerful incentives to flee that have only intensified since his arrest. Parnas is facing charges that, in total, carry a statutory maximum of more than 30 years in prison. Under the United States Sentencing Guidelines, his advisory Guidelines range—based only on the presently charged conduct—is expected to exceed 5 years in prison. *See United States v. Khusanov*, 731 F. App'x 19, 21 (2d Cir. 2018) (affirming denial of bail where the defendant faced a possible maximum prison term of 30 years, and holding that "a district court does not clearly err in concluding that a defendant facing a potentially lengthy prison sentence possesses a strong motive to flee."). Moreover, the evidence of Parnas's guilt is overwhelming, as set forth in the detailed 20-page Indictment, which quotes from emails and other communications sent by Parnas and his co-conspirators. The Government's evidence has only become stronger since Parnas's arrest, as the Government has executed numerous search warrants, interviewed witnesses, and obtained additional documents from third parties. *See United States v. Briggs*, 697 F.3d 98, 102 (2d Cir. 2012) (citing strength of government's evidence in finding that defendant presented substantial risk of flight). Parnas is also aware that he is under investigation for additional crimes, and that it is likely that he will be charged with additional offenses. Given the weight of the evidence, the likelihood of forthcoming charges, and the expected length of the potential sentence, any individual would be highly incentivized to flee; with Parnas's particularly strong ties abroad, that incentive is even greater.

### C. Parnas Has Misled Pretrial Services and the Government

Parnas—who is already charged with making false statements—appears to have made false—or, at best, inconsistent and materially misleading—statements to Pretrial Services and the Government regarding his assets and income. These statements appear designed to hide Parnas's assets from Pretrial and the Government, and to mislead his supervising Pretrial Officer into permitting Parnas to evade his bail conditions. Given that both outcomes would have allowed Parnas to flee more easily, it forcefully underscores the flight risk Parnas poses, and shows that not even the most stringent pretrial release conditions can reasonably assure Parnas's appearance.

Parnas made misleading statements about his income and assets at the time of his arrest and initial detention. As described above, around the time of his arrest, Parnas provided three different accounts of his assets to Pretrial Services and the Government: (i) On October 15, 2019, Parnas told Pretrial Services that his assets totaled approximately $43,500 in cash with two vehicles, and that he earned $50,000 per year from the Law Firm, and $30,000 annually from GEP; (ii) on October 17, 2019, Parnas's counsel represented to the Government that Parnas's total assets included approximately $452,000 in cash; and (iii) on October 29, 2019, Parnas completed the Affidavit under penalty of perjury, and stated that his assets included approximately $5,644 in

cash, $30,000 in jewelry, and two vehicles. But each of these vastly divergent pictures of Parnas's assets fails to account for significant additional sums that the Government has only recently identified, which were not disclosed to either Pretrial or the Government:

- Between August and October 2019, Parnas received $200,000—not $50,000, as he told Pretrial Services—from the Law Firm into Account-1, which was held in Svetlana Parnas's name, in what appears to be an attempt to ensure that any assets were held in Svetlana's, rather than Lev's, name.[5] A portion of this money existed in Account-1 at the time that Parnas submitted his financial affidavit, and, to the Government's knowledge, does so today, underscoring that Parnas continues to mislead the Government and the Court about his financial condition.

- Parnas failed to disclose, in describing his income to the Government and Pretrial Services, the fact that in September 2019, he received $1 million from a bank account in Russia into Account-1. While the majority of that money appears to have been used on personal expenses and to purchase a home, as discussed below, some portion of that money existed in Account-1 at the time Parnas submitted his financial affidavit.

- At the time of his arrest, Parnas had at least $200,000 in an escrow account, in connection with his intended purchase of a property located in Boca Raton, Florida, which was listed for sale at approximately $4.5 million. The escrow account was funded with $200,000 from Account-1 in September 2019. Parnas did not disclose this asset (either the property or the funds in the escrow account) to either Pretrial Services or the Government. It is unclear whether Parnas proceeded with this real estate purchase or received the funds back from the escrow account.

These were not Parnas's only misstatements to Pretrial. As noted above, Parnas further misled Pretrial into believing that the Court had effectively approved his request to leave his house each day. This behavior is troubling, and confirms that even stringent conditions, of the sort he is currently under, are insufficient to secure his compliance with bail. *See United States v. LaFontaine*, 210 F.3d 125, 135 (2d. Cir. 2000) ("LaFontaine's past circumvention of court orders demonstrates that pretrial monitoring is not sufficient.").

Parnas's submission of the false Affidavit alone is sufficient to trigger Section 3148(b)'s rebuttable presumption that "no condition or combination of conditions could reasonably assure the safety of other persons in the community," and satisfies the first element of Section 3148(b)(1). *See United States v. Bartok*, 472 Fed. App'x 25, 28 (affirming revocation of bail based on defendant's omissions in a sworn financial affidavit, and upholding the district court's finding that the "magnitude of the omissions" in the affidavit was "probably willful" and supported a probable cause finding that the defendant had committed the crime of perjury). In addition, Parnas's efforts to hide his assets from Pretrial and the Government, reduce the amount of cash surety that he would lose should he flee, and mislead Pretrial in an effort to remain out of his house for eight hours a day, strongly suggest a plan or intent to flee, *see* 18 U.S.C. § 3148(b)(2)(A). Moreover, his lack of candor on such material issues underscores the risk of flight he poses, and shows that any trust the Court places in Parnas would be significantly misplaced.

---

[5] In March 2016, Parnas was ordered to pay a civil judgment totaling approximately $508,734 at that time, which remains unpaid. *See Pues Family Trust v. Parnas*, 11 Civ. 5537 (E.D.N.Y.).

December 11, 2019
Page 8

### D. The Nature and Circumstances of the Offense and Parnas's History Further Underscore the Risk of Flight

The nature and circumstances of the offense—which include the use of straw donors to make political contributions, efforts to hide the true nature of funds and assets, and lies to the FEC—further underscore the substantial risk of flight and noncompliance that Parnas poses.

At base, Parnas is charged with crimes involving fraud, deception, and foreign influence. With respect to the Foreign Donor Scheme, Parnas and his co-defendants conspired to circumvent the federal laws against foreign influence by engaging in a scheme to funnel money from Foreign National-1 to candidates for federal and State office to buy potential influence with candidates and governments. The defendants hid the scheme from the candidates, federal regulators, and the public by laundering foreign money through bank accounts in the names of limited liability companies and through the use of straw donors. With respect to the Straw Donor scheme, Parnas and Fruman made contributions in the name of GEP and Fruman in order to conceal the true source of the funds for the donations and skirt federal reporting requirements. They concealed this conspiracy by, among other things, making and causing others to make false statements to the FEC. Against the backdrop of the fraud and deception with which he is charged, Parnas's efforts to conceal his assets and income from Pretrial Services and the Government and mislead Pretrial Services strongly indicate that his pattern of fraud and deceit will only continue, and that he is unlikely to abide by the terms of his release, *see* 18 U.S.C. § 3148(b)(2)(B). *See also United States v. Handler-Jacobs*, 697 Fed. App'x 86, 87 (2d Cir. 2017) (affirming pretrial detention of white-collar defendant who posed a substantial risk of flight, where the district court "relied on documentary evidence indicating that Handler-Jacobs had actively participated in a massive international fraud" involving "foreign bank accounts and international travel").

Finally, the Court can and should take into account Parnas's years-long refusal to comply with a civil judgment against him, and his efforts to hide assets in his wife's name to ensure that he remains judgment-proof. These actions indicate a lack of respect for the law.

### E. Parnas's Existing Bail Conditions Do Not Adequately Mitigate His Risk of Flight

Parnas's risk of flight cannot be adequately mitigated by GPS tracking or home confinement. Moreover, the mere fact that Parnas has not yet fled—particularly in light of his efforts to mislead Pretrial Services over the two months he has been released in order to secure greater liberties—provide no basis to believe that the existing conditions are sufficient to ensure his compliance and appearance.

*First*, although GPS monitoring is reasonably effective at allowing Pretrial Services to ensure that a defendant remains confined to a specific premises like a house, it is not at all effective at allowing Pretrial Services to ensure that once a defendant *leaves* his house, he is not fleeing the United States. Parnas's suggestion that "[e]very traffic light he stops at, left or right turn he takes, and even the speed at which he drives would be monitored and recorded" wrongly assumes that a dedicated Pretrial Services officer would be assigned to do nothing but monitor Parnas's whereabouts 24 hours a day. That is simply false. Instead, Parnas would be free to board a private jet or other mode of transportation with little likelihood that the Government would find out and be able to stop him until it is too late. *See United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993)

(recognizing ease with which electronic monitoring can be circumvented). It is an unfortunate reality that defendants regularly flee the United States even though they are on GPS monitoring and their passports have been seized. *See, e.g.*, *United States v. Rufai*, 19 Cr. 201 (DLC) (defendant on electronic monitoring cut his bracelet and fled to Canada although he had surrendered his passport); *United States v. Raza*, 18 Cr. 398 (VEC) (defendant on GPS monitoring fled and is believed to have left the country, although he had surrendered his passport); *United States v. Camarena-Familia*, 18 Cr. 649 (KPF) (defendant on GPS monitoring fled to the Dominican Republic although he had surrendered his passport); *United States v. Rodriguez*, 18 Cr. 149 (RA) (defendant on electronic monitoring fled); *United States v. Felix-Leonardo*, 17 Cr. 636 (KPF) (defendant on electronic monitoring fled to the Dominican Republic using a new passport, although he had surrendered his passport); *United States v. Liriano*, 17 Cr. 388 (KMW) (defendant on location monitoring fled and is believed to have left the country, although he had surrendered his passport); *United States v. Calderron-Cebballos*, 17 Cr. 409 (KPF) (defendant on location monitoring cut off his bracelet and fled to Canada); *United States v. Elm*, 16 Cr. 356 (ER) (defendant fled to Canada although he had surrendered his passport ); *United States v. Atuana*, 16 Cr. 672 (KPF) (defendant obtained new U.S. passport and left the country although he had surrendered his passport); *United States v. Ceglia*, 12 Cr. 876 (VSB) (defendant on GPS monitoring fled to Canada despite surrendering his passport).

Parnas can already leave his house for court appearances, to meet with counsel, and for medical and religious appointments; even if this were increased to home incarceration, he could still leave the house for discrete reasons. But his deceptive conduct in connection with securing bail conditions and then attempting to loosen those conditions, as detailed above, counsel against even permitting him those abilities to flee. *See, e.g.*, *United States v. Brennerman*, 705 F. App'x 13, 16 (electronic monitoring, home detention, and the use of relatives as sureties were insufficient where defendant posed substantial risk of flight, including lack of ties of the United States and prior history of deceit); *United States v. Mercedes*, 254 F.3d 433, 437 (2d Cir. 2001) (concluding that electronic monitoring and home detention were insufficient in case of defendant who posed substantial risk of flight, and reversing grant of pretrial release even though defendant's fiancée and siblings would act as sureties).

*Second*, the fact that Parnas has not yet fled does not provide a basis to continue his bail. Parnas's efforts to mislead Pretrial Services and the Government over the past two months significantly undercut any weight that should be afforded to his prior compliance. *See United States v. Berkun*, 392 Fed. App'x 901, 903 (2d Cir. 2010) (affirming the district court's decision to detain a defendant accused of white-collar fraud despite his citizenship status, roots in the community, family, and history of appearing in court because while those factors "might appear to favor release," detention was warranted because, in addition to the weight of the evidence, the defendant committed the crime while on bail and concealed his assets from the court, "having thereby deceived the court as to his willingness to conform his conduct to law."); *United States v. Porter*, No. 03-CR-0129 (CPS), 2007 WL 3232502, at *6 (E.D.N.Y. Nov. 1, 2007) (detaining the defendant pending his supervised release hearing, in part because his failure to abide by the conditions of his release and his "defying any orders with which he does not agree" have "established his inability to abide by any court-imposed conditions.").

Moreover, given the information that has emerged about Parnas's true financial picture—which he did not disclose to Pretrial or the Government at the time of his arrest—it is clear that the existing bail package is woefully insufficient to ensure Parnas's appearance. Parnas provided a materially misleading picture of his assets and income to Pretrial Services and the Government

in order to secure his release on terms that were favorable to Parnas. Parnas has posted $200,000 to secure his bond, based on his representations that it was all the money or property he could post. But given that Parnas received over a $1 million in September 2019 alone, intended to purchase a home worth approximately $4.5 million, and has access to other sources of funding that equal or exceed the amount of the bond, it is clear that $200,000 is not a meaningful amount of money to Parnas. *See Berkun*, 392 F. App'x at 903-4 (defendant's concealment of assets from the court and prosecution indicated that the defendant could easily "finance his flight from and life outside of the United States," and affirming detention where "the deceit evidence by the concealment of millions of dollars and the commission of a crime while on bail release properly permitted the court to conclude that it could not rely on Berkun to abide by any bail conditions."). What is more, the cosigners to Parnas' bond, his wife and son, could easily flee with him and do not possess sufficient cash or property to satisfy the amount of the bond. Svetlana Parnas is a stay-at-home mother with assets of approximately $210,000 in cash and jewelry. Aaron Parnas is a full-time student with assets of less than $20,000 in cash and jewelry. Given that neither Svetlana nor Aaron own any property, earn no income, and do not have substantial assets, were Parnas to flee—including with Svetlana or Aaron—the Government would have no recourse to recoup the bond.

## CONCLUSION

For all of the foregoing reasons, the Government respectfully submits that each of the requirements of Section 3148(b) are met, and accordingly, the Court "shall enter an order of revocation and detention." 18 U.S.C. § 3148(b). Parnas submitted a false financial affidavit under penalty of perjury, *id.* § (b)(1)(A) and (B); there are no conditions that will ensure that Parnas will not flee, *id.* § (b)(2)(A); and Parnas has demonstrated that he is unlikely to abide by any condition or combination of conditions, *id.* § (b)(2)(B). Moreover, Parnas should also be detained pursuant to 18 U.S.C. § 3142 (e) because "no condition or combination of conditions will reasonably assure [Parnas's] appearance."

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By:    /s/
Rebekah Donaleski
Nicolas Roos
Douglas Zolkind
Assistant United States Attorneys
(212) 637-2423/2421/2418

cc:     Counsel of record