UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

UNITED STATES OF AMERICA,

- against-

ANDREY KUKUSHKIN, *et al*.,

Defendants.

------------------------------------------------------------ X

S3 19 Cr. 725 (JPO)

**SENTENCING MEMORANDUM OF ANDREY KUKUSHKIN**

March 1, 2022

GERALD B. LEFCOURT, P.C.
Gerald B. Lefcourt
Faith A. Friedman
1776 Broadway, Suite 2000
New York, N.Y. 10019
Tel: (212) 737-0400
Fax: (212) 988-6192
Email: lefcourt@lefcourtlaw.com
*Attorneys for Andrey Kukushkin*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..... 1

INTRODUCTION ..... 2

LEGAL STANDARD ..... 3

ARGUMENT ..... 4

1. Introduction ..... 4

2. Andrey's Personal and Professional Background ..... 6

3. Andrey's Family is Dependent Upon Him ..... 9

   a. Andrey's Father ..... 9

   b. Andrey's Fiancé and Stepdaughter ..... 12

   c. Andrey's Son ..... 14

   d. Conclusion ..... 14

4. [redacted] ..... 15

5. The Offense Conduct/The Evidence at Trial ..... 16

   a. Andrey Had No Knowledge or Experience with Campaign Finance or Election Law ..... 16

   b. Andrey Wanted to Build a Lawful Cannabis Company ..... 16

   c. Parnas, Fruman, and Correia Desperately Need Money ..... 17

   d. Parnas and Fruman Steal the First $500,000 from Muraviev ..... 17

   e. Parnas, Fruman, and Correia Need Even More Money ..... 18

   f. Parnas and Fruman Steal the Second $500,000 from Muraviev and Try to Steal Another $2 Million ..... 19

   g. Fruman's November Contributions ..... 19

6. Other Considerations ..... 20

6. Other Considerations ....................20

a. There is No Risk of Recidivism ....................20

b. General Deterrence Does Not Require a Sentence of Imprisonment ....................21

c. Need to Avoid Disparity Amongst Similarly Situated Defendants ....................22

7. The Government's Guidelines Calculation Does Not Accurately Reflect the Offense Conduct and Andrey's Alleged Role ....................24

8. Andrey's Choice to Exercise His Constitutional Right to go to Trial Should Not Impact His Sentence ....................27

9. The Appropriate Sentence Taking into Account § 3553(a) Factors ....................28

CONCLUSION ....................30

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------X
UNITED STATES OF AMERICA,

S3 19 Cr. 725 (JPO)

-against-

ANDREY KUKUSHKIN, *et al.*,

Defendants.
-----------------------------------------------X

**SENTENCING MEMORANDUM OF ANDREY KUKUSHKIN**

**PRELIMINARY STATEMENT**

This memorandum and the accompanying character letters are respectfully submitted on behalf of Andrey Kukushkin to assist the Court in determining the appropriate sentence in this case. Andrey was convicted after trial of conspiracy to violate federal election laws and aiding and abetting the making of a contribution by a foreign national.

We submit that under the unusual circumstances of this case; Andrey's critical and unfortunate role as a caretaker for his dependent family; his lack of criminal record; the extensive period of Pretrial Supervision, home confinement and electronic monitoring he already has served, all without issue; his initial night of pretrial detention while awaiting presentment in California; and in consideration of the sentences of his co-defendants, their greater culpability and more significant criminal conduct (both charged and uncharged); a non-custodial sentence is appropriate. Such a disposition would allow him to continue to be a source of vital hands-on assistance for his family during this particularly difficult time and more meaningfully serve the community.

## INTRODUCTION

This case and Andrey Kukushkin are not what the government tried to make them out to be. In the end, the case was not about secret contributions made or foreign money funneled into United States elections by Parnas and Fruman to meddle in U.S./Ukrainian foreign policy or affairs, including removal of the U.S. Ambassador to Ukraine, possibly at the behest of a foreign official – conduct with which Andrey was never alleged to have been involved. It was not even about a foreign national actively seeking to interfere in U.S. elections. Nor was it about $1 million in foreign money actually seeping its way into the election system and to political candidates. Rather, it was about two men, Parnas and Fruman who wanted to be big shots, who wanted to live the high life, who wanted to rub elbows with the rich and powerful, and needed other people's money to do so. Unfortunately for Andrey, he was in the wrong place at the wrong time, he had a friend with money, a dream to build a successful cannabis business, and Parnas and Fruman, with the help and encouragement of Correia, seized upon all of it.

Andrey Kukushkin had no political background or experience. He was born, raised, educated, and spent nearly half his life overseas. He was a businessman looking to establish a legal cannabis company. Although the indictment charged multiple federal election law schemes, along with a fraud scheme, Andrey was charged only in connection with one and even then, there can be no doubt he was the least culpable and played the smallest role.

It is not that Andrey does not accept responsibility. On the contrary, he accepts that he sent the text messages admitted at trial. He accepts that he agreed to enter into a joint cannabis venture with Parnas and Fruman on little more than a handshake; that he trusted them to do the right thing; that they intended to pursue the joint venture with the same sincerity and tenacity as he did; that Parnas and Fruman wanted to see the venture succeed; that they too aimed to secure cannabis licenses lawfully either through the application process or through acquisition from

current license holders; that $1 million was loaned by Muraviev to Fruman's company towards these goals; and that the funds provided by Muraviev would be used to lawfully pursue this venture. Andrey also accepts that when discussions of "donations" came up he did not delve deeper or question, instead staying hyper focused on the ultimate goal of securing licenses and building a lawful cannabis business and doing so lawfully, using lawyers and lobbyists and professionals, or so he expected.

Andrey did not, however, knowingly and intentionally lie to the FEC, as did Parnas, Fruman, and Correia. He did not lie to multiple people on multiple occasions over the course of many years in connection with the GEP, Fraud Guarantee and Joint Cannabis Venture Frauds in order to steal millions of dollars from individual victims, as did Parnas, Fruman, and Correia. Andrey did not make political contributions, review or have familiarity with campaign literature or campaign finance disclosures or rules, as did Parnas, Fruman, and Correia. He did not even make the decision to issue $1 million in loan proceeds or come up with the structure of the loans, that was Muraviev in conjunction with his financial team and Fruman. He certainly did not come up with the idea of making political contributions, or identify campaigns to which to make the contributions, to the extent any were made, he had no interest in it, that was all Parnas, Fruman, and Correia. In short, he overtly did very little, if anything, on behalf of the Foreign Donor Scheme. Indeed, it was as if he was an afterthought in this prosecution – a seeming add on at the bottom of the indictment.

**LEGAL STANDARD**

Following *United States v. Booker*, the Guidelines became advisory. 543 U.S. 220, 259 (2005). While the Guidelines remain a "starting point and the initial benchmark", the district court is to weigh all of the § 3553(a) factors in determining the appropriate sentence to impose. *Gall v. United States*, 552 U.S. 38, 49 (2007). In this regard, sentencing courts are to take a

holistic approach and consider "the nature and circumstances of the offense", as well as "the history and characteristics of the defendant". 18 U.S.C. § 3553(a)(1). In the end, the sentenced imposed is to be "sufficient but not greater than necessary", to "reflect the seriousness of the offense", to "promote respect for the law", to "provide just punishment for the offense", to "afford adequate deterrence to criminal conduct", and "to protect the public from further crimes of the defendant". 18 U.S.C. § 3553(a)(2)(A) – (C). No longer is the sentencing court constrained to find "'extraordinary' circumstances" to justify a non-Guidelines sentence. *Gall*, 522 U.S. at 47. Instead, all that is necessary is "an individualized assessment based on the facts presented". *Id*. at 50.

As the following discussion will make clear, no matter how the advisory Guidelines are calculated, when considered in the context of Andrey's life as a whole and his relative culpability as compared to his co-defendants, Andrey is a man who is deserving of leniency when it comes to the imposition of his sentence and a non-custodial sentence for this devoted son, and loving father, with no criminal record, is both appropriate and warranted.

## ARGUMENT

### 1. <u>Introduction</u>

While we attempt to detail aspects of Andrey's life, the letters provided herewith illuminate his character and family circumstances more deeply, and far more persuasively, than could be summarized by counsel. As you will see, written by people from differing backgrounds, these letters present a vivid picture of Andrey as a kind, giving, and compassionate individual, who is dedicated to and needed by his family, and committed to helping others.

Despite his own struggles, Andrey has found a way to put others' needs, particularly those of his family, first and provide the assistance they require. Indeed, the letters are replete

with examples of Andrey's selflessness and reflect the positive impact he has had and continues to have on people's lives. We ask the Court to read them in full, but we provide some highlights here:

> I owe my life to Andrey. As a gay man who grew up in Ukraine, Soviet Union, I was a constant subject of bullying and abuse. Andrey stood up for me as a kid and a young teen and saved me from violence countless times.
>
> Andrey saved my life again, when after years of tortured existence, that is still such for LGBTQ community in Ukraine, I moved to the United States and contemplated suicide. … When we arrived in 2002, Andrey opened his San Francisco home to me and my parents… For months after my arrival to San Francisco I was deeply depressed, torn, confused, and lost in the new place, homesick, yet terrified of my old life back in Ukraine. I was contemplating taking my own life. Andrey's insight, sensitive and inquisitive heart caught the red flags. His patience, compassion and empathy saved me. He would sit with me from dusk till dawn night after night and listen, he would drag me out to show me the fabulous new world, San Francisco. I do not exaggerate — he saved my life.

*See* Letter of Leo Volobrynskyy.

> Not very long ago my father had a [redacted], I brought him home while he still was under the influence of strong painkillers, he couldn't walk at all and I needed to get him from the car to the house. I, was concerned how will I get him in since he is way too heavy for me. Luckily for me Andrey was visiting that day and he carried my dad from the car to the bedroom, carefully laid him down so he could rest. If Andrey wasn't around, I would have had a terrible time and my dad would have to wait a long time in a car post-surgery until I could get someone to help…

*See* Letter of Oksana V. Kotyrlo.

> In our friendship, he has really been there for me, especially when the company I worked for closed. He made it a point to be there and show a significant of support during a sudden and arduous job search. It was Andrey that was a source of camaraderie for both me and my family…
>
> In addition to our friendship, he is a usually upstanding member of the neighborhood by giving free tennis lessons to underserved kids, organized sports activities and summer camps.

*See* Letter of Peter Rivelis.

> Despite my disability, I continue to be an avid skier, though this requires adaptive equipment and help from ablebodied individuals, which is why I typically ski with adaptive programs such as the Disabled Sports of Eastern Sierra. On this recent trip

> Andrey insisted on providing any assistance necessary, including carrying me up and down stairs whenever ramps were not available. Andrey also remained by my side throughout the trip to ensure my safety and enjoyment, even when this meant not spending time with the rest of our group or foregoing enjoyment of more challenging terrain that would be beyond my abilities.

*See* Letter of Anton Serikov

**2. <u>Andrey's Personal and Professional Background</u>**

Andrey Kukushkin was born [redacted], in Odessa, Ukraine. He is the eldest of Diane (nee Elyasheva) and Felix Kukushkin's two children. Andrey's younger brother, Stanislav, was born in Ukraine as well. Growing up in Soviet Ukraine during that time, particularly as a Jew, was anything but easy. Resources, whether food, clothing, money, or books were hard to come by and antisemitism was more than tolerated, it was the norm. Indeed, as a Jewish student, getting admitted to top universities was virtually impossible. As a result, the Kukushkins were forced to practice their religion in secret and hide their true selves from neighbors and community members.

Diane and Felix, both children of holocaust survivors, overcame the odds. They earned engineering and technology degrees, and despite immense obstacles were even able to find employment. Despite all the hate in the outside world, which included bullying at school, and as noted a lack of basic resources, the Kukushkin home was filled with love. The Kukushkin children were taught the value of hard work, hope, and remembrance. As to the latter, it was particularly important not to forget those who had sacrificed so that one day Andrey and his brother could live free from oppression, discrimination, and the horrors of war. As detailed *infra*, Andrey never forgot.

As a child in Soviet Ukraine, Andrey attended school, surrounded himself with other children facing the same hurdles, studied harder, and found sanctuary in sports where he excelled. As is often the case, Andrey realized that sports could be a great equalizer. By the age

of 12, Andrey was competing in national swimming tournaments, followed later by competitive tennis which he continued at the university level. He was a good student and received the equivalent of his high school diploma from the Ministry of Public Education of the Ukrainian SSR (Soviet Socialist Republic).

For Andrey, however, it was his sports achievements that helped break barriers, even gaining him entry into a mechanical engineering program at Polytechnic University of Ukraine where he received a degree in engineering and economics. Still, life remained difficult in Ukraine; with devastating poverty and political unrest, the Kukushkins dreamed of coming to the United States. Andrey first had the chance while studying at the University, coming to the United States as an exchange student. Later, in 1993, when the Kukushkins finally were afforded the opportunity to immigrate to the United States legally, they jumped at it. With virtually no money, little but the clothes on their backs, and no jobs, they settled in the United States in search of a better life and future. Six years later, Andrey became a naturalized United States citizen.

Upon arriving in San Francisco, Andrey took classes at a local college, including English as a second language, to help him assimilate and his family communicate. It was there that Andrey met Muraviev and they became friends.

Andrey's father was fortunate to find a job as a software engineer, while his mother struggled to learn English, acclimate to a new country and take care of her younger son. To help, Andrey obtained his USTA Coaching Certification and offered tennis lessons to children at the local Jewish community center. For those who could not afford them, Andrey provided lessons for free. It was a great success. *See* Letter of Elina Koman. The program expanded to multiple locations and ultimately a summer sports camp. *See* Letters of Gene Kristul; Igor Kogan.

Andrey found it very fulfilling and the students not only enjoyed it but often found great success, some going on to play competitively and in college. *See* Letters of Oksana V. Kotyrlo; Svitlana Shcherbakova.

Thereafter, Andrey pursued employment in the financial world. It was during this time, that Andrey met his first wife and had a son, [redacted] is the center of Andrey's world. Around the same time, Andrey was offered a job at a Moscow and Geneva-based company. He accepted it and the family moved overseas where Andrey remained until 2014. When [redacted] was about 5 years old, Andrey and [redacted] mother divorced. It was a difficult time for Andrey. [redacted] mother left with [redacted] and took him to live in London, making it difficult for Andrey to see him. It was a lengthy and contentious divorce but Andrey did not give up. He loved his son and was determined to have a meaningful relationship with him. Fortunately, when the divorce was settled Andrey was afforded significant custodial time with his son and the two are very close. *See* Letters of Svitlana Shcherbakova; Oksana V. Kotyrlo; Alex Rudakov. Indeed, [redacted] splits his time between Andrey and his mother, with his primary residence currently with Andrey and attending school in the United States. Like Andrey, [redacted] is a talented tennis player and athlete, although his love is basketball.

While overseas, working mostly in Moscow and Geneva, Andrey reconnected with Muraviev, as he was a client of Andrey's employer. The two rekindled their friendship and remained close since.

In 2014, after working overseas for nearly 8 years, Andrey returned to San Francisco, without a job, because his father was sick, in need of [redacted] and Andrey's help. *See* Letter of Felix and Diane Kukushkin. For several years he lived off savings and investments and helped his father and mother. *Id.* Then in 2016, Andrey ventured into the real estate business with a

particular focus on the cannabis space. Muraviev became an investor in some of the projects in which Andrey was involved. One of the projects was Oasis – the project in which Andrey sought Fruman's investment and ultimately lead to Andrey being approached about the joint cannabis venture with Parnas, Fruman, and Correia.

Since then, Andrey's world has been turned upside down, he was forced to give up his interest in at least one of his projects, and others have been impacted. As the Court is no doubt aware, the cannabis industry is a highly regulated business. A criminal conviction is a significant impediment, if not bar, to licensing and thus, ownership. But more to the point, even to the extent licensing is not required, mere association with someone with a federal criminal conviction is seen as problematic, in fact, it is often an obstacle to opening a bank account and obtaining financing. Thus, it is unclear to what extent Andrey will be able to be involved in his current projects.

**3. <u>Andrey's Family is Dependent Upon Him</u>**

As the PSR recognizes, Andrey's family is particularly dependent upon him and since his conviction in this case that dependence has only grown. *See* PSR ¶75, 82, 88-89, 91; *see also* Letters of Felix and Diane Andrey; Svitlana Shcherbakova; and Stanislav Kukushkin.

**a. <u>Andrey's Father</u>**

In 2014, Andrey's father [redacted]. Seven years later [redacted]. Resistant [redacted], Felix Kukushkin was convinced by his family to [redacted]

he was also the only source of support for his mother, fiancé and his stepdaughter. Now more than a month later, [redacted] *See* Letters of Felix and Diane Kukushkin; Stanislav Kukushkin.

The road ahead is difficult. [redacted] Andrey is responsible for handling that. *See* Letter of Stanislav Kukushkin. Someone will need to [redacted]. *Id.* The Kukushkins will rely on Andrey for that as well. *Id.* Diane is not physically able to do so, as [redacted] Indeed, [redacted] Andrey's brother lives hours away, works and has four children of his own, one of whom is an infant and is unavailable to assist. *See* Letters of Felix and Diane Kukushkin; Stanislav Kukushkin. As Stanislav explains:

> [redacted] …Andrey is the only help and support. It's impossible to overestimate how much help he is providing now. All the worries of [redacted] As of right now he is in the process of remodeling the house of my parents [redacted] While supporting our mother and father morally, he runs the majority of errands that used to be my dad's chores. Soon our [redacted] My dad is a large man, so my mother simply cannot physically do it on her own. Although doctors say that there might be a chance of recovery, without Andrey's daily help this chance will most certainly perish.

*Id.*

Before this unexpected and devastating occurrence, it was Andrey who visited his parents weekly and helped them shop, clean, get to various medical and other appointments, and take care of various errands. *See* Letter of Svitlana Shcherbakova. At present, Andrey visits his parents daily or almost daily. His mother relies upon him to take her shopping, to take her to visit Felix, to bring food and other supplies [redacted] to handle all the chores and obligations Felix handled at the couple's home and much more. *See* Letter of Stanislav Kukushkin. [redacted] *Id.* Without Andrey, she would be lost.

As Andrey's father, pleads:

> Andrey is returning all the love and care given to him back to his parents when it's most needed. [redacted] he dropped a successful career in a prominent investment bank and returned home to support me without a moment's hesitation. [redacted]
>
> ***
>
> I am writing this letter [redacted] Our younger son has his hands full with three children and a newborn.
>
> Our only hope is that Andrey could help us physically, emotionally and if he is ever able, financially…
>
> We respectfully ask Your Honor for leniency when deciding the fate of our son. Our small family has no one else that can help us in this hour of need.
>
> Andrey made a colossal mistake, and yet he is irreplaceable in providing physical, emotional and financial support to me, my wife and his kids.

*See* Letter of Felix and Diane Kukushkin.

Andrey's fiancé, Svitlana Shcherbakova, has witnessed Andrey's efforts firsthand, and relates:

> [redacted] Andrey takes her to father [redacted] helps with cleaning the house, brings food and provides great moral support. Soon [redacted] and apart from Andrey, no one will physically be [redacted] Andrey is now the only help for mom and dad, since I don't speak English well, and his brother has four children, with whom Andrey also constantly helps.

*See* Letter of Svitlana Shcherbakova.

These circumstances are extremely trying and difficult to manage, and Andrey's family looks to and relies upon him to handle it all. *See* Letters of Felix and Diane Kukushkin; Stanislav Kukushkin; and Svitlana Shcherbakova. Despite everything that is going on in his own life, including his pending sentencing, Andrey has risen to the occasion, never saying no. There simply is no one available to fill his shoes were he to be sentenced to any period of incarceration. *Id.*

**b. <u>Andrey's Fiancé and Stepdaughter</u>**

It is not just Andrey's parents who depend on him. Andrey is currently engaged to Svitlana Shcherbakova, who he has known for 20 years. Ms. Shcherbakova and her [redacted] daughter, [redacted], moved to the United States approximately 3 years ago and Andrey has been their sole support network ever since. As Ms. Shcherbakova writes in her letter to the Court, "Andrei emotionally supported me after a difficult divorce from my ex-husband, providing me with care and all possible assistance in moving and adapting to the United States". *See* Letter of Svitlana Shcherbakova. The PSR provides further details of the assistance Andrey provides Ms. Shcherbakova and her daughter in their daily lives, particularly given Ms. Shcherbakova's limited English skills. This includes helping her navigate the educational system, taking [redacted]

to school, communicating with [redacted] teachers, helping her locate and enroll [redacted] in extracurricular activities, just to name a few. *See* PSR at ¶88. As a result, [redacted] has formed an exceptionally close bond with Andrey, viewing him essentially as a father, and there is a real concern that losing him will result in significant trauma and force Ms. Shcherbakova to return to Ukraine. *See* Letter of Svitlana Shcherbakova. As Ms. Shcherbakova explains to the Court:

> [redacted] fell in love with Andrey with all her heart and perceives him as her father. She barely recovered from parting with her father, and the prospect of losing Andrey now will be a real trauma for her. In addition, without his help, I will not be able to cope alone with a child in immigration and will be forced to return to Ukraine, where there is a war going on now.

*Id.*

Were all of this not enough, today, as he fights for his freedom, Andrey continues to embody the values his parents instilled in him as a child, particularly of not forgetting those who sacrificed their lives so that he can live in a world free of hatred and war. To that end, he has been out protesting the war ravaging his native country, destroying the lives of his friends and family, and he has opened his heart and even home to those in need during these tumultuous times. *See* Annexed photograph. Over the past week, he also took on the added responsibility of helping to care for Ms. Shcherbakova's 80-year-old mother who fled from Kyiv, Ukraine leaving behind everything, including her grandchildren who are still trapped in Kyiv alternating between hiding in bomb shelters and actively fighting the Russian invaders, as well as her eldest daughter, a nurse in the maternity ward of a Kyiv hospital who continues to work to ensure the safety of the pregnant women and newborns of Kyiv. Ms. Shcherbakova's mother speaks no English and is currently living with Andrey whom she relies on to assist her in this new country and new city during this exceptionally stressful time.

**c. Andrey's Son**

Finally, Andrey's son also needs him. Prior to this school year, [redacted] was living with Andrey and attending school in San Francisco, playing competitive sports. Unfortunately, while visiting his mother [redacted]. With all the publicity from the case and the trial looming, Andrey wanted to protect his son from the questions, the media attention, and the attendant stress. Thus, after spending several months with Andrey in San Francisco, [redacted] [redacted] was enrolled in a school in Virginia that focused on sports, had a good [redacted]), and would keep him out of the spotlight. He was supposed to return to San Francisco after the Christmas break to live with Andrey [redacted]. [redacted]. And so, [redacted] returned to school in Virginia, instead of Andrey's home fulltime. However, he will be staying with Andrey during the upcoming break. [redacted] is fearful that his father is going to be taken from his life and it has become a lot to shoulder. To be sure, because his mother resides in the United Kingdom, and because of his grandfather's condition, we do not believe that [redacted] will be able to see his father throughout any period of incarceration.

As Andrey's father pleads:

> His teenage son and his stepdaughter need their father by their side at this most challenging stage of their life.

*See* Letter of Felix and Diane Kukushkin.

**d. Conclusion**

Here, Andrey's family circumstances are relevant to determining the appropriate sentence in this case and constitute a mitigating factor that warrants a non-custodial sentence. They

clearly exceed the kind of adversities common to families where one parent or child is sentenced to prison and someone else is left behind to pick up the pieces. Given the degree to which Andrey's family members need him for support in their daily lives and that there is no one else available to take his place, and the significant disruption and trauma any period of incarceration could cause, we submit that Andrey's family circumstances further support a non-custodial sentence which would allow him to continue to play that pivotal role as caretaker to those who need him and be a part of his son's and daughter's lives.

**4.** [redacted]

For the past couple of years, [redacted]

## 5. The Offense Conduct/The Evidence at Trial

What follows are the relevant facts adduced at trial which we submit bear most substantially on sentencing, in particular, the enhancements related to the value of the "transactions", the only Guidelines calculation as to which there is a dispute.

### a. Andrey Had No Knowledge or Experience with Campaign Finance or Election Law

Andrey was born, raised and educated in Odessa, Ukraine. GX 755; S-12. He immigrated to the United States in 1993 and was naturalized as a United States citizen in 1999, at the age of 26. *Id.* He is not registered to vote (S-3), has never voted (*id.*), and has never made a political contribution (S-10).

### b. Andrey Wanted to Build a Lawful Cannabis Business

In the summer of 2018, Andrey discussed with Fruman the possibility of investing in Oasis, a real estate project focused on the cannabis space. During those discussions, Andrey was approached about entering into a joint venture to operate a cannabis business with Fruman and his business partner, Parnas. It was anticipated that this joint venture would be funded by a $1 million loan from Muraviev, a wealthy Russian national and a long-time friend of Andrey. GX 25; GX 31-A-7. Andrey's goal was to establish a lawful cannabis business and obtain a "network of licenses" for retail cannabis operations in various states throughout the United States. GX 25.

By mid-July, an initial "understanding of the joint activities ha[d] been reached", a structure for the joint venture proposed and responsibilities allocated. GX 25. Parnas and Fruman were to be responsible for "Lawyers/Lobbyists" and the joint venture's "Goals" were to "quickly take control of a network of licenses for stores in California…" (*id.*). Andrey continued to discuss the potential of a separate investment by Parnas and Fruman in the "Friends & Family

round" of "Oasis Fund" and "advisory board seats [sic]" (*id.*; *see also* DX A-3). Correia even visited Andrey in California under the guise of being interested in learning more about Andrey's Oasis business operations. DX B-2; DX B-8; DX B-9.

**c. Parnas, Fruman, and Correia Desperately Need Money**

It was all a set up for Muraviev's money. As Correia said, "great opportunity with these guys since Big Andre is funding". DX B-4. After all, Andrey was "not a smart businessman", and the issues being dealt with were "literally retarded" which "create[d] a great opportunity for [Parnas, Fruman, and Correia]", particularly given the serious financial hardships they were experiencing. *Id.* Parnas and Fruman had incurred nearly $500,000 in credit card debt over the course of several months by charging travel, entertainment, clothing, restaurant, education, and other living expenses. GX 203. Included among the charges were political contributions the pair had made between June 5 and July 5 for the benefit of GEP totaling $136,000. *Id.*; *see also* GX 114; GX 117; GX 120; GX 121; GX 124; GX 160. Parnas and Fruman were desperate for money for their own personal and GEP related endeavors, (Tr. 807:13-809:4 (Van Rensburg)[1]), and began pressuring Andrey and Muraviev for money under the guise of the anticipated joint cannabis business (GX 33).

**d. Parnas and Fruman Steal the First $500,000 From Muraviev**

On September 18, 2018, Muraviev wired $500,000 to FD Import Export, Fruman's United States company, pursuant to a loan agreement. GX 42, 42-A-12; GX 31, 31-A-7. While the text exchanges indicated the monies were to fund the joint cannabis venture, nevertheless, unbeknownst to Andrey, the very next day, the money was used to pay off the $495,000

[1] Unless otherwise specifically indicated citations to "Tr." followed by page and line numbers refer to the trial transcript.

outstanding balance on the FD Import Export credit card account. GX 203; GX 408; GX 1403. There was nothing left for the cannabis venture.

e. **Parnas, Fruman, and Correia Need Even More Money**

At the end of September/early October, Parnas and Fruman needed more money and two disputes arose between the parties. First, Andrey expected Parnas to pay travel expenses he understood were related to the joint cannabis venture; Parnas refused. GX 52; GX 57; GX 58. For the first time, Correia told Andrey that he understood the first $500,000 (which by now was gone) had been earmarked for "charitable/political donations", not operational expenses like travel. GX 52. Andrey insisted that the funds must be used to pay the expenses – evidently unaware that the funds had been used to pay Parnas's and Fruman's personal expenses. GX 52. So adamant that these costs were to be paid for by the joint venture, which was the point of the message, Andrey refused to pay his own way and did not travel to Miami for the supposed meeting. GX 58.

The second fight centered on Parnas's and Fruman's demand for the second $500,000 tranche. GX 58. Andrey and Muraviev argued that (as far as they knew) the first $500,000 had yet to be spent and they had seen no results – no efforts on behalf of the cannabis venture had been undertaken, no license applications had been submitted, no licenses purchased, nothing. GX 58; GX 61. To act as if some effort had been made, Parnas had Correia work to get the joint venture's business entity operational and open a bank account. GX 54. Parnas then had Correia create a list of contributions and donations that Parnas and Fruman allegedly had made or pledged on behalf of the joint venture, entitled the "SIG Contribution list". GX 54; GX 144; GX 146. This was the first Andrey had been made aware of these alleged contributions, none of which had been or ever were made. S-11; GX 58, GX 58-A-70; GX 61, GX 61-A-5.

**f. <u>Parnas and Fruman Steal the Second $500,000 From Muraviev and Try to Steal Another $2 Million</u>**

Nevertheless, on October 16, 2018, Muraviev wired the second $500,000 tranche to FD Import Export. GX 48. True to form, Parnas and Fruman stole this money as well. Approximately $79,000 was used to pay the FD credit card bill, $33,000 was used to pay off FD's line of credit, another $3,150 was paid to an FD vendor, and the bulk of the remainder was divvied up between Parnas and Fruman with $100,000 going to Fruman and $263,000 to GEP (Parnas). GX 203; GX 408. A small amount remained in the FD Import Export account to cover company expenses. *Id.* No contributions were made with the Muraviev funds, and none were used for the benefit of the cannabis venture.

At the end of October, Parnas and Fruman tried to extract an additional $2 million from Muraviev, but he and Andrey refused. GX 82; GX 83; GX 84.

**g. <u>Fruman's November Contributions</u>**

On November 1, 2018, Fruman made two $10,000 contributions, one to Adam Laxalt (running for Governor of Nevada) and another to Wes Duncan (running for Nevada Attorney General), using the FD Import Export credit card and listing GEP as his employer. GX 155; GX 156. Both Laxalt and Duncan were opponents of cannabis legalization (Tr. 546:2-4 (Laxalt); Tr. 155:18-19 (Duncan)). The credit card bill for the Laxalt and Duncan contributions was not paid until December 24 and even then, only partially paid. GX 203. According to the testimony at trial, it was impossible to know if any funds from Muraviev were used to pay down the credit card balance containing the contribution charges (Tr. 1043:1-9 (Espinoza)) or if either contribution had ever been paid (Tr. 1066:2-25 (Espinoza)).

**6. <u>Other Considerations</u>**

**a. <u>There is No Risk of Recidivism</u>**

A custodial sentence is not necessary to protect the public from Andrey under § 3553(a)(2)(C). Research conducted by the United States Sentencing Commission establishes a general inverse correlation between age and criminality. *See* United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* 22-23 (2017)[2]; *see also* United States Sentencing Commission, Recidivism Among Federal Offenders: A Comprehensive Overview 23 (2016). Indeed, the Second Circuit has accepted the Sentencing Commission's conclusion that recidivism decreases with age, and over 90% of first-time offenders over the age of 50 never commit another crime. *United States v. Jenkins*, 854 F.3d 181, 192 (2d Cir. 2017).

At nearly 50 years old, Andrey stands convicted of his first offense. As such, he falls into the category of offenders recognized as having one of the lowest rates of recidivism. *See id*; *see also* United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of The Federal Sentencing Guidelines* (2017) (stating that for those defendants in Criminal History Category I, the recidivism rate for defendants who are between the ages of 40 and 49 is 25.9 percent whereas the recidivism rate for younger such defendants was substantially greater (53 percent for such defendants younger than 30 years of age, 35.3 percent for those between the ages of 30 and 39)). As simply stated by the Sentencing Commission, "older offenders are substantially less likely to recidivate …compared to younger cohorts. … as age increases recidivism by any measure declined". *Id*. at p. 30; *see also United States v. Sloane*, 308 F.R.D. 85, 88 (E.D.N.Y. 2015) (sentencing 53-year-old to time served and supervised

---

[2] https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders

release, not 24–30 months' Guideline range, because "[a]t age fifty-three, [he] is unlikely to recidivate").

In light of the foregoing and having been fully compliant with the terms of his strict pretrial release and supervision, we submit that Andrey presents a low risk for future criminal conduct further supporting a non-custodial sentence.

**b. General Deterrence Does Not Require a Sentence of Imprisonment**

Further, there is no need to impose a custodial sentence to serve an interest in "general deterrence". The circumstances of this case, for this defendant, are unique. Were the public to know all the facts, including that the contributions were made months earlier and paid as part of an outstanding balance on a credit card; that they were delineated for the benefit of Parnas's and Fruman's energy business; that Parnas and Fruman essentially stole the money; that Andrey had no familiarity with federal election or campaign finance law as opposed to Parnas and Fruman who had received and reviewed and completed multiple campaign finance forms; that unlike Fruman, Parnas, and Correia, Andrey did not lie to the FEC; that unlike Fruman, Parnas, and Correia, he did not engage in multiple frauds, designed to steal money from individual victims; that unlike Fruman, Parnas, and Correia, he had no interest in making political contributions, did not in fact make any such contributions, and played no role in identifying to whom such contributions would be made, if any; that Fruman is still obligated to repay the loans and legal action has been taken against him to enforce that obligation; and that Andrey was seeking to establish a lawful cannabis venture; we have no doubt that its confidence in and respect for the criminal justice system would not be diminished by a sentence of community service. Nor would such a sentence promote the perception that Andrey's crime of conviction was not a serious one or that it will not be vigorously prosecuted by the United States. *See* Richard Frase, *Punishment Purposes*, 58 Stanford L. Rev. 67, 80 (2005), and Elizabeth Szockyj, *Imprisoning*

*White Collar Criminals*?, 23 S. Ill. U. L.J. 485, 492 (1998); *see also accord* National Institute of Justice, *Five Things About Deterrence* (May 2016), ("prison sentences (particularly long sentences) are unlikely to deter future crime".).[3]

**c. <u>Need to Avoid Disparity Amongst Similarly Situated Defendants</u>**

As the PSR recognizes and the Court is keenly aware, Fruman and Correia both received sentences that deviated significantly from the Guidelines. Accordingly, in order to avoid a disparity amongst similarly situated defendants, the PSR recommends that Andrey also receive a non-Guidelines sentence. We agree, however, we submit that Fruman and Correia are substantially more culpable and engaged in substantially more criminal conduct than Andrey and, thus, Andrey should receive a substantially more lenient sentence than either of them.

The indictment charged three distinct schemes, (1) the FEC Scheme; (2) the Foreign Donor Scheme; and (3) the Fraud Guarantee Scheme, comprised of seven counts. As detailed below, in reality, there were two additional schemes for a total of five. The other two were GEP and Cannabis Joint Venture Schemes perpetrated by Parnas, Fruman, and Correia.

According to the indictment, Correia was involved in all three charged schemes and he was charged in all seven counts. He was accused of and plead guilty to lying to federal agencies in connection with the FEC Scheme and to assisting Parnas in defrauding individual investors of more than $2 million over the course of years in connection with the Fraud Guarantee Scheme. In addition to that, he was charged with participating in the Foreign Donor Scheme – with conspiring, with soliciting, and with aiding and abetting the making of contributions by a foreign national. His role was far more significant than that of Andrey. He was Parnas's right-hand man and, in that capacity, he worked with Fruman (and Parnas), to solicit the money from Muraviev,

[3] https://www.ncjrs.gov/pdffiles1/nij/247350.pdf

to form the entity that was supposed to become the cannabis company, to open the bank accounts, and to try and convince Andrey that the monies provided were supposed to be used for donations. And, as Parnas's right hand and point of contact in most instances, like Parnas (but unlike Andrey) he had seen and was familiar with contribution forms which list rules against foreign and straw donations. He also played a key role in identifying campaigns to which contributions purportedly should be or allegedly had been (although they were not) made. Further, he participated with Parnas and Fruman in conning Andrey and stealing Muraviev's money. Finally, he played an active role in trying to help Parnas and Fruman legitimize GEP to secure investors and business partners under false pretenses when GEP too was a farce. In short, he played a "critical" or "pivotal" role and was involved in a repeated fraudulent activity. *See* Dkt. 171 at pp. 1, 9.

As for Fruman, he was charged in both the FEC and Foreign Donor Schemes and charged in all six counts. He was accused of affirmatively lying to a federal agency, lying to various political campaigns, soliciting the funds from Muraviev to make the contributions at issue, and actually making many of the illegal contributions. Many of the text messages admitted at trial were authored by Fruman and amount to pressure tactics designed to elicit funds from Muraviev and he had private phone conversations with Muraviev about them. Further, he had familiarity with election laws, having filled out or received many donation materials which included many of the rules allegedly violated. In other words, based on the government's allegations he was a critical player and played a "lead role" in the scheme without whom much of the conduct could not have occurred. *See* Dkt 296 at p.3. He also separately engaged in an uncharged fraud on Muraviev and Andrey – stealing the funds intended for the joint cannabis venture for his own

personal benefit. Similarly, he also actively participated in the GEP fraud, again for his own personal financial gain and benefit.

Andrey, on the other hand, was charged only in connection with the Foreign Donor Scheme and even then, only with two out of the three counts (originally only one). He played no role in proposing the idea of making campaign contributions, identifying to whom such contributions should be made, or in making contributions. Indeed, he had no knowledge that the contributions had been made. Nor did he have knowledge, experience, or familiarity with campaign finance or federal election laws. He was not charged with or alleged to have had any involvement in the FEC Scheme or the Fraud Guarantee Scheme, much less the two uncharged schemes. Nor did he affirmatively lie to any federal agency. And, of course, there is no one who was personally harmed by Andrey's alleged offense conduct.

In short, Correia and Fruman were alleged to have engaged and actually engaged in significantly more criminal conduct than Andrey, and by the government's account, are significantly more culpable. Accordingly, Andrey is deserving of significantly more leniency in fashioning his sentence.

**7. The Government's Guidelines Calculation Does Not Accurately Reflect the Offense Conduct or Andrey's Alleged Role**

The government contends that the proper valuation of the transactions at issue for purposes of the Guidelines calculation is $1 million, resulting in an adjusted offense level of 24. Probation agrees. We submit that this is inaccurate and that the correct Guidelines adjusted offense level is 10 based on no monetary transaction enhancement.[4] In Criminal History Category I, level 24 has an advisory sentence of between 51- and 63-months' imprisonment;

[4] Alternatively, at most, an 8-level enhancement based on a transaction value of $136,000 for the contributions made by Parnas and Fruman in June is all that is warranted.

level 10, which is the level advocated by the defense, has an advisory sentence of between 6 and 12 months.[5] As the Court is aware, these ranges are not mandatory but rather a starting point in the Court's sentencing analysis. To the extent that the Court credits the government's and PSR's analysis, we submit the resultant offense level does not accurately reflect the offense conduct or Andrey's alleged role therein.

Andrey was charged and convicted of one count of conspiracy to violate the federal election campaign act and one count of aiding and abetting the making of contributions by a foreign national. As to the latter, there is no question the value of the transactions for purposes of the Guidelines is not $1 million. That is because under no version of the facts did the full $1 million in loan proceeds from Muraviev get donated. On the contrary, nearly 90% of it was used to fund Parnas's and Fruman's lavish lifestyles, support their families and promote GEP. As to the former, the conspiracy count, it is the government's position, adopted by Probation, that the conspiratorial agreement contemplated $1 million in contributions, even if in fact, they were never made. We submit that the evidence does not bear that out.

First, by all accounts, the defendants agreed to pursue a lawful cannabis venture. As detailed in Andrey's Rule 29/33 motions and adduced at trial, there was ample evidence that even assuming *arguendo,* some portion of the loan proceeds were to be used for contributions, a substantial portion of them were to be used for other expenses including professionals, licensing fees, overhead costs, office space, travel expenses and personnel costs. *See e.g.*, GX 25; GX 52; GX 61. Indeed, there were a number of text messages and disputes between Parnas, Fruman, Andrey, Correia and Muraviev on these points. *See id.* To the contrary, there is no text exchange

[5] If using a transaction value of $136,000, the applicable offense level is 18, which carries a Guidelines sentencing range of 27- to 33- months.

among the many the government contends sets forth the parties' agreement which supports the notion that the full $1 million in loan proceeds were expected to be used for political contributions and donations. At best, under the government's reimbursement theory the value of the transactions was $136,000 – the amount of the contributions made and months later paid with the proceeds from the first $500,000 Muraviev loan. More accurately, however, the amount should be zero given that the contributions were not made in furtherance of any joint cannabis venture.

Finally, to the extent the Court holds that the value of the transactions for purposes of calculating the advisory Guidelines level is $1 million, we submit that the 14-level enhancement based on U.S.S.G. § 2B1.1, suffers from patent arbitrariness and irrationality that has caused courts in this circuit to criticize and render the "loss" table of limited value. *See, e.g., United States v. Corsey*, 723 F.3d 366, 378–79 & 380 (2d Cir. 2013) (Underhill, J., concurring) (warning that "the loss guideline is fundamentally flawed, especially as loss amounts climb"); *see also, United States v. Johnson*, No. 16-Cr-457-1 (NGG), 2018 U.S. Dist. LEXIS 71257, at *11-12 (E.D.N.Y. Apr. 27, 2018) ("As far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime."); *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (Rakoff, D.J.) ("By making a Guidelines sentence turn, for all practical purposes, on [loss enhancement], the Sentencing Commission . . . effectively guaranteed that many such sentences would be irrational on their face".). Thus, even if the Court adopts the government and Probation's position as to the appropriate Guidelines calculation, we submit that this is a case in which the Court should "rely

more heavily on the § 3553 factors" in determining a reasonable and appropriate sentence. *See Johnson*, 2018 U.S. Dist. LEXIS 71257, at *12.

**8. <u>Andrey's Choice to Exercise His Constitutional Right to go to Trial Should Not Impact His Sentence</u>**

According to the United States Sentencing Commission's data on trials, between 2015 and 2020, only 2.6% of cases have gone to trial. Said another way, during that period 97.4% of federal defendants have plead guilty. *See United States Sentencing Commission Interactive Data Analyzer*.[6] As a recent report by the National Association of Criminal Defense Lawyers lays out:

> over the last fifty years, trial by jury has declined at an ever-increasing rate to the point that this institution … has been replaced by a "system of [guilty] pleas" which diminishes to the point of obscurity, the role that the Framers envisioned for jury trials as the primary protection for individual liberties and the principal mechanism for public participation in the criminal justice system.

*The Trial Penalty: The Sixth Amendment Right to Trial on the Verge of Extinction How to Save It,* NACDL, 2018, at p. 5 (internal citations omitted).[7] The reason, according to the NACDL Report, "individuals who choose to exercise their Sixth Amendment right face exponentially higher sentences if they invoke the right to trial and lose". *Id.* The United States Sentencing Commission's data on federal sentencing confirms the existence of a trial penalty.

The PSR acknowledges many factors that warrant a sentence well below the Guidelines. Still, without the benefit of acceptance of responsibility points for entering a plea, Andrey's advisory Guidelines are *de facto* higher than that of his co-defendants, who by all accounts are substantially more culpable and who engaged in significantly more criminal conduct, including criminal conduct that victimized identified individuals. The sole reason: he chose to exercise his

---

[6] https://ida.ussc.gov/analytics/saw.dll?Dashboard

[7] www.nacdl.org/trialpenaltyreport

constitutional right to a fair trial. Under the circumstances of this case, such an outcome is unjustified and unwarranted.

As former United States District Judge John Gleeson, wrote, "Putting the government to its proof is a constitutional right, enshrined in the Sixth Amendment; no one should be required to gamble with years and often decades of their liberty to exercise it". Forward, *The Trial Penalty: The Sixth Amendment Right to Trial on the Verge of Extinction How to Save It,* NACDL, 2018. While we are not talking years or decades in this case *per se*, even to consider the fact that Andrey went to trial, when he did not testify, and did not challenge the credibility or veracity of the witnesses but instead pointed to flaws in the government's narrative, challenged the inferences the government asked the jury to draw, and the legal implication of the evidence is, pure and simple, a trial penalty. Particularly considering, as noted, Andrey's lesser role as compared to Fruman and Correia, it is unjustified.

As The Honorable Jed S. Rakoff explained, the role of a jury trial is "not only as a truth-seeking mechanism and a means of achieving fairness, but also as a shield against tyranny. As Thomas Jefferson famously said, 'I consider [trial by jury] as the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution'". *Why Innocent People Plead Guilty,* N.Y. Times, Nov. 20, 2014. If we continue to punish defendants like Andrey for availing themselves of that shield, we risk forever yielding our power and rights to the government. The mere fact that Andrey chose to go to trial should have no bearing on his sentence.

**9. <u>The Appropriate Sentence Taking into Account § 3553(a) Factors</u>**

Considering all these factors, we believe that the appropriate sentence in this case for this defendant is one that does not include a period of incarceration. The fact of the conviction itself along with the negative publicity generated by this case have already had a profound adverse

effect on Andrey. He has had to divest himself of his interest in at least one project; most, of the other projects in which he was involved have stalled; he was incarcerated in San Francisco upon his initial arrest; he has served over two years under Pretrial Supervision without issue, including portions of that under home detention and electronic monitoring; he has experienced financial hardship and has been forced to rely upon the generosity of his family to pay legal fees in defending himself; and, he received no financial gain as a result of the charged offense.

But more to the point, Andrey is desperately needed by his family, there is no one else to fill his shoes and his absence will be exceptionally disruptive. When considered along with the fact that there should be no concern that he will engage in unlawful conduct in the future and thus, no need for further measures to assure specific deterrence, [redacted], and by all accounts he was less involved than his co-defendants, it is clear that any punishment other than community service, which will allow him to serve the community good and be there for his family in their profound time of need, is unwarranted.

## CONCLUSION

For all the reasons stated herein, we urge the Court to impose a non-custodial sentence in this case. If the Court believes that additional punishment is necessary, we ask that it consider imposing a condition of community confinement or home detention, with a community service component, so that Andrey can continue to provide the critical support his family needs from him.

We thank the Court for its consideration.

March 1, 2022

Respectfully submitted,

GERALD B. LEFCOURT, P.C.

By: /s/ Gerald B. Lefcourt
Gerald B. Lefcourt (GBL5030)
Faith A. Friedman (FAF 6066)

1776 Broadway, Suite 2000
New York, N.Y. 10019
(212) 737-0400 (phone)
(212) 988-6192 (fax)
lefcourt@lefcourtlaw.com
ffriedman@lefcourtlaw.com
*Attorneys for Andrey Kukushkin*