33. After receiving the ▆ Contribution list, Muraviev sent an additional $500,000 to Parnas and Igor Fruman (at ▆ ▆ Account) in October 2018. Specifically, based on my review of financial records, I have learned the following:

   a. On or about October 16, 2018, the ▆ Account received a $500,000 transfer from ▆, Cyprus, from an account at the ▆. Based on my review of public sources, it appears that ▆ has the same registered director, secretary, and address as ▆ Cyprus. The day before the transfer, the account balance of the ▆ Account was $5,982.16. The same day that the ▆ Account received the wire transfer from ▆, those funds were used to pay a $79,054 ▆ credit card bill at ▆, and nearly all of the remaining money was wired out to accounts controlled by Parnas and Igor Fruman.

   b. Based on my review of records from ▆, I have learned that the ▆ credit card account was used to pay for two donations on November 1, 2018, which were made in Igor Fruman's name: $10,000 to ▆ for Nevada, and $10,000 to ▆ – Candidate for Nevada Attorney General, which are discussed below. Thus, Muraviev's money appears to have funded these donations, both of which were on the ▆ Contribution List.

   c. Based on my review of financial records, it appears that most of Muraviev's funds from the second wire transfer were not used for legitimate cannabis-related business expenses, but were instead used for personal expenses, other payments to consultants, and the donations to ▆ and ▆. In addition, based on my review of emails obtained pursuant to the January 18 Warrant, I believe that this is the second transfer contemplated by Correia's "Cannabis Schedule

and budget" described above, which was circulated within days of the group's Las Vegas meeting, and contemplated that funding in the amount of $500,000 would be due on October 1, 2018.

34. Based on my review of emails obtained pursuant to the January 18 Warrant, the Text Chain, and public reporting, I have learned the following about the political activities and conversations of Parnas, Fruman, Kukushkin, Muraviev, and Correia after Muraviev made the second $500,000 wire transfer in October 2018:

a. On or about October 19, 2018, ▇▇▇ emailed ▇▇▇ at the ▇▇▇ National Committee, to confirm that Parnas, Igor Fruman, and Kukushkin would attend an October 20, 2018 campaign rally that featured ▇▇▇ and President Trump. ▇▇▇ wrote that, with respect to making a donation, "think the only problem we might run into is that our FEC lawyer has advised us not to make any contributions until this matter is resolved. But I will double check with both our lawyers and Lev to see how we should proceed." Based on my participation in the investigation, I believe that ▇▇▇ was referring to the FEC complaint filed against Fruman and Parnas, discussed above, related to the $325,000 donation from GEP to ▇▇▇.

b. On or about October 20, 2018, Kukushkin, Parnas, and Igor Fruman attended the campaign rally for ▇▇▇ in Nevada.[12] Kukushkin, Parnas, and Fruman sent 10 photographs of themselves to Muraviev. The photographs depict, among other things, Kukushkin posing with ▇▇▇ a candidate for Nevada state attorney general; and Kukushkin with Parnas and Igor Fruman.

---

[12] Based on my review of the Text Chain, it appears that ▇▇▇ left the Text Chain on or about October 19, 2018, and thus did not receive any messages sent after that date.

c. On or about October 22, 2018, a member of ▮ staff emailed Parnas, and noted that "▮ asked [that] I reach out and send you his W9. I have also attached his contribution form." ▮ emailed ▮ staff member the next day because "Lev asked me to get in touch with you regarding donations," and subsequently coordinated the donation with the staff member over the next week. ▮ confirmed that the donation had been made on November 1, 2018, in the amount of $10,000, in response to which ▮ campaign staff asked if the donation was "just" the $10,000. Based on my review of emails obtained pursuant to the January 18 Warrant, including the "▮ Contribution List," I believe that Parnas may have committed to donate $50,000 to ▮ but only donated $10,000, which, as noted above, was funded by Muraviev.

35. Based on my review of the Text Chain, I have learned the following:

a. Following the October 20, 2018 rally, Kukushkin learned that their efforts to obtain retail licenses in Nevada were failing, including because the group had missed the September 20, 2018 application deadline,[13] and he advocated taking additional steps to "change the rules" in order to benefit their business interests, which he noted would need the Governor's approval. As noted above, the group had donated to ▮ a Nevada gubernatorial candidate.

b. Starting on or about October 30, 2018, it appears that Parnas, Igor Fruman, Kukushkin, and Muraviev had a disagreement with respect to the next steps for their business venture. Parnas complained in a text message that "It['s] very disturbing after all our talks and

---

[13] Based on my review of Nevada law and information published by Nevada's Marijuana Enforcement Division, I have learned that Nevada law permits the Nevada Department of Taxation (the "DOT") to allocate recreational retail marijuana licenses. The DOT only accepts applications for recreational retail licenses during limited time periods. On July 5, 2018, the DOT announced that it would accept applications during September 7, 2018, and September 20, 2018, for a limited number of recreational retail licenses. The DOT has not held a subsequent application period since that time, and has not announced whether any additional licensing periods will open.

meetings that we are still nowhere in our understandings," and proposed "to stop this partnership and meet to discuss how we can move forward."

c. Muraviev responded in Russian. Based on my review of a draft translation of Muraviev's response, I have learned that Muraviev stated that "In Las Vegas we agreed on principals of our cooperation and share in future enterprise, as well as a movement strategy. It was decided that I will provide $1 million for our future enterprise (500 Nevada, California and 500 New York, New Jersey). As of today, I fulfilled all my obligations completely! Then we're supposed to work on obtaining licenses at these states. If our company is registered, then we have to move to the part two, filing the applications. Yesterday Igor told me that 2 more millions needed for other states. It was not in our agreement! And if conditions change, then I have no objections against termination of our partnership. I plan to be at the USA after November 15, ready for meetings." Based on my participation in the investigation and my review of materials obtained pursuant to the January 18 and May 16 Warrants, I believe that Muraveiv's reference to "$1 million for our future enterprise" referred to his payment of $1 million to fund donations to politicians in five states, as set forth in Correia's "Cannabis Schedule and budget" described above. In addition, because by this time Muraviev had already transferred $1 million to Parnas and Igor Fruman, he confirmed that "I fulfilled all my obligations completely!" However, the revised version of Correia's donation document, the "███ Contribution" list, added additional states and donations which totaled more than $2 million. This change appears to have been conveyed to Muraviev by Igor Fruman ("Yesterday Igor told me 2 more millions needed"), which led Muraviev to dispute that the additional amount for the other states was "not in our agreement."

d. In response, Parnas wrote, "I don't want to discuss everything over text when we met in vegas I agree I also thought we are [on] the same page and yes you sent what discussed for

37

part one the 2 mm that Igor spoke with you was a suggestion not a deal changer. We did very thing we are supposed to do with part 1 but we never started part 2 – office and personal to do the work. Now as far as deal changing it is your partner that told me a different deal than we discussed I wanted to send this text when I was in vegas but Igor talked me into waiting til he spoke with you."

e. Kukushin replied to the Text Chain that, "I believe we all have a clarity from day 1 and precise course of action. We have performed everything that we have agreed upon on our end. The Nevada company has been formed, the operating agreement signed and bank account opened. *Money transferred by Andrey M to Global Energy was to support the very specific people & states (per Igor's table) in order to obtain green light for licensing.* I haven't changed any rules of our engagement and was present at all the scheduled meetings with officials in Nevada." (emphasis added). Based on my participation in the investigation and my review of materials obtained pursuant to the January 18 and May 16 Warrants, I believe that Kukushkin was referring to the fact that they had formed ▇ signed an operating agreement, and opened a bank account as they had agreed. Kukushkin's reference to Muraviev's money being intended to "support the very specific people & states (per Igor's table)" was a reference to the specific donations intended in the five states set forth in Correia's "Cannabis Schedule and budget" described above, which Correia forwarded to Parnas, which appears to have ultimately been provided to Igor Fruman and/or Kukushkin and Muraviev.

f. On or about October 31, 2018, Igor Fruman wrote, "Just a reminder what they told in Las Vegas in Kunya's presence: They give us right and possibility to become as ▇ and ▇ for this town and state!!!!!!!!" Based on my participation in the investigation, I believe that Igor Fruman was referring to what "they," possibly Nevada politicians or candidates, told

38

Fruman and Kukushkin in Las Vegas, namely that they could be as rich as ▮ and ▮ ▮, wealthy casino magnates from Las Vegas.

  g. Later on October 31, 2018, Muraviev replied in Russian (which has since been translated): "Good morning, everybody! If the question is opening of the office in Vegas, then I suggest taking careful, business-like approach to it. Particularly, we need to define goals, get the employees and give them clear-cut tasks. In my opinion, organizing office and spending 100K a month, as Igor suggests, is not practical at the current stage of company development. I just don't see goals [y]et! If we need an office in NY, then we have to understand what for. . . . After receiving first licenses, we can organize central business office. That's how it usually works! And it seems that we agreed on it."

  h. A few days later, Parnas and Kukushkin had a further disagreement about an intended donation to ▮ As noted above, while a $10,000 donation had already been made, the group had planned to donate more to ▮ On or about November 4, 2018, Parnas wrote, "Kunya make sure you get ▮ the 12,500 !!! I was very embarrassed just now they said they never received the check from ▮. I don't understand?"[14]

  i. Kukushkin replied, "Excuse me ?! *Leva, the money where wired to Global Energy in order to cover all the donations whatsoever.* What does it have to do with ▮? You are the ones issuing them the checks NOT me or Andrey. You should be embarrassed bringing it up after all." (emphasis added). Parnas wrote back, "Are you fuckin crazy What are you talking about you when to meet him and the VP and pledged 12,500 from ▮ I don't want to play these games You are going to get everybody in trouble." Kukushkin replied, "From us – not ▮

---

[14] From my involvement in this investigation, I have learned that ▮" is the name of one of Kukushkin's cannabis businesses, which is based in San Francisco.

doesn't do any business in Vegas." Based on my training, experience, and participation in this investigation, I believe that this dispute centered around whether the money that Muraviev had already wired was intended to cover this donation to ▮

   j. Parnas wrote, " Your fuckin sick [y]ou don't remember what you say to people[, t]his is the governor and attorney general[, h]e came up to me and asked about the group he met ▮ and why they still don't send a check[.] I'm not going to argue with you[, y]ou can talk to Igor." Kukushkin clarified, "We were supposed to tell him that the check(s) from ▮ are indeed the donations from us." Parnas wrote back, "This is crazy and stupid shit I'm done." Kukushkin replied, "You supposed to tell them, not me!"

   36. Based on my review of public sources, I am aware that federal and state election commissions have the authority to subject campaigns to fines and financial penalties if they violate the campaign finance laws by accepting foreign-funded donations. This is true specifically with respect to Nevada state law. Thus, had the ▮ and ▮ campaigns in particular been aware of information that the defendants hid from them (that Muraviev was the true source of the donations) then it appears that they would not have accepted those donations. Thus, the defendants exposed the campaigns to which they donated to the risk of economic harm by hiding information regarding the ultimate source of funds, in violation of certain of the Subject Offenses.

   37. Based on my review of emails obtained pursuant to the January 18 Warrant, it appears that Parnas, Fruman, and Correia ceased their business relationship with Kukushkin and Muraviev in or about November 2018. Specifically, in a memorandum drafted by Correia to Parnas dated November 17, 2018, Correia outlined problems with respect to the proposed cannabis business with Kukushkin, including that Kukushkin's existing cannabis ventures were poorly

managed. In addition, based on my review of bank records, it does not appear that Parnas or Fruman ever returned or repaid Muraviev his $1 million.

Contributions to Representative ▓▓▓ and Unregistered Activities as Foreign Agents

38. In 2018 and 2019, Parnas, and possibly others, appear to have worked to remove the U.S. Ambassador to Ukraine, ▓▓▓ at the direction and request of a Ukrainian government official, in violation of certain of the Subject Offenses.

39. Based on my review of emails obtained pursuant to the January 18 Warrant and my review of public reporting, I have learned that going back to at least 2016, Parnas and Fruman had close relationships with Ukrainian government officials, to include ▓▓▓ (then-Head of the State Fiscal Service of Ukraine),[15] ▓▓▓ (then-General Prosecutor of Ukraine), and ▓▓▓ (then-President of Ukraine). Parnas also appears to have acted as an intermediary on their behalf in the United States. Specifically, I have learned the following with respect to Parnas's activities in 2016 and 2017 related to Ukrainian officials:

a. In December 2016, Fruman flew with ▓▓▓ from Munich to Miami, and arranged a dinner for ▓▓▓ Fruman, Parnas, Correia, and others at ▓▓▓ on December 15, 2016, apparently to pitch ▓▓▓ on investing in ▓▓▓ a fund associated with Correia. Based on my review of financial records, I have learned that ▓▓▓ subsequently wired $500,000 (from "▓▓▓," which based on my review of publicly available corporate records, appears to be a U.K. company that was dissolved in 2018) to an account Parnas controlled on January 11, 2017 (unrelated to ▓▓▓ the fund that Correia pitched). Based on my

---

[15] Based on my review of public reporting and participation in the investigation, I have learned that the State Fiscal Service of Ukraine is a governmental agency that combines the powers of tax authorities, customs, and financial police, and is responsible for, among other things, implementing state tax and customs policy.

41

review of emails obtained pursuant to the January 18 Warrant, I have learned that ▮ transferred the funds to Parnas pursuant to a promissory note, signed only by Parnas, which described the funds as a loan.[16]

 b. Several weeks later, Parnas began communicating with ▮, a Florida-based lobbyist, in order to have ▮ represent ▮ personal interests in the United States. Between December 2016 and January 2017, Parnas served as an intermediary between ▮ and ▮ and received a referral fee from ▮ after ▮ was retained. However, it appears that ▮ and Parnas took efforts to hide the fact that ▮ was the ultimate client: in an early draft of a retainer agreement circulated in early January 2017, the client was listed as a British law firm "acting in the interests of ▮, a citizen of Ukraine." However, after ▮ told Parnas that he needed to run the contract by the Senate Foreign Relations staff, subsequent drafts (and the final signed version) omitted any reference to ▮ and described the client simply as the British law firm. Email correspondence makes clear that ▮ was the ultimate client: Parnas sent the contract (which he received from ▮ to ▮ for his final signature, although a woman signed the contract as an "authorized representative," and Parnas directed ▮ pay ▮ $100,000, which ▮ appears to have done. The contract memorialized an agreement for ▮ to "consult with the Client and advocate on its behalf" on any issues "before the Federal government of the United States" in exchange for $100,000 per month, plus costs.

 c. Parnas also solicited ▮ help in ensuring that ▮ and other Ukrainian officials were invited to the U.S. presidential inauguration, and had access to tickets to inaugural

---

[16] Based on my review of bank account records, it appears that Parnas used these funds for largely personal expenses, and does not appear to have repaid ▮

events. On January 4, 2017, Parnas emailed ▉ a copy ▉ passport, with the subject line "Inaugural." On January 11, 2017, Parnas asked ▉ for invitation letters, apparently to the Inauguration, for ▉, ▉ (a Ukrainian entrepreneur and former government official), and ▉ (the former Prosecutor General). On January 14, 2017, a representative of the inaugural committee emailed Parnas to confirm that tickets had been set aside for Parnas, Fruman, ▉ ▉. It appears that ▉ attended at least some inaugural events with Parnas, and while ▉ may have been invited, he did not attend.

      d. Following the presidential inauguration, Parnas acted again as an intermediary between ▉ and the Ukrainian government. On February 10, 2017, ▉ emailed Parnas a copy of a contract for services between the "Government of Ukraine" and ▉, which appeared to be separate from ▉ work for ▉ (which was already subject to a paid retainer and signed contract). On February 14, 2017, ▉ sent Parnas a copy of a letter from ▉ to President ▉, in which ▉ apologized for not being able to travel to meet ▉, but looked forward to meeting him in New York to "discuss the issues of importance to Ukraine in its relations with the United States." Parnas then forwarded a copy of the letter to ▉ However, ▉ terminated his work on behalf of these Ukrainian clients shortly thereafter: on February 19, 2017, Parnas forwarded ▉ a copy of an article in the ▉ ▉ entitled "A Back-Channel Plan for Ukraine and Russia, Courtesy of Trump Associates." ▉, the managing partner of ▉ Washington office, wrote back "Not good." On March 14, 2017, ▉ emailed Parnas in reference to ▉ "representation of the [British law firm]," and wrote that because they have not "received any direction" in the three months they have been under contract, ▉ was terminating the agreement. Parnas replied, "Got it. I will let them know." Based on my review of Department of Justice filings related to FARA, I have

43

learned that neither ▇ nor Parnas registered under FARA in connection with any work performed in 2017 for ▇, the British law firm, or the government of Ukraine.

40. Based on my review of materials obtained pursuant to the May 16 Warrant and public reporting, it appears that at least two events—both of which were subsequently referenced by ▇ ▇[17] the Ukrainian Prosecutor-General, in his communications with Parnas regarding ▇ removal in the spring of 2019—appear to have provided motives for ▇ or others allied with then-President ▇ to seek ▇ removal in the spring of 2018. Specifically, I have learned the following:

a. According to public reporting, on April 4, 2018, Ukraine's National Anti-Corruption Bureau ("NABU") released an audio recording of ▇, the head of the Special Anti-Corruption Office ("SAPO") implicating ▇ in corruption. According to public reporting, NABU receives funding from the U.S. and European Union aid programs, and has worked with U.S. law enforcement to share information in the past. In the recordings, ▇ tipped off corruption targets that they were going to be searched, and pressured anti-corruption prosecutors and judges. As discussed below, ▇ referenced this episode the following year, when she called for ▇ removal. Based on subsequent messages

---

[17] Based on my review of public reporting and participation in the investigation, I have learned that ▇ appointed ▇ as Prosecutor-General on or about May 12, 2016, after the former Prosecutor-General, ▇, was removed from his office by parliament. According to public reporting, ▇ has no legal training and is an ally of ▇. Based on my review of the May 16 Warrant returns, I have learned that according to a message between Parnas and ▇ dated May 2, 2019, Parnas referred to ▇ as "the head of the Ukrainian ▇ party." According to public reporting, in 2014, ▇ was elected the leader of the Bloc of ▇ political party. In August 2015, the Ukrainian Democratic Alliance for Reform merged with the Bloc of ▇ party, and ▇ became its leader. ▇ is currently the mayor of Kiev, and was a former professional boxer who hired Rudolph Giuliani in 2008 as a campaign consultant. In September 2019, ▇ was fired by ▇ the newly-elected president of Ukraine.

44

between ▮ and Parnas which are discussed below, in which ▮ arranges for ▮ to be interviewed by a journalist as part of their efforts to remove ▮, it appears that ▮ and ▮ are aligned, or at the very least, are aligned in their opposition to NABU and ▮.

b. According to public reporting, in early 2018 ▮ led an investigation into corruption within the State Migration Service ("SMS"), which led to the arrests of NABU agents. ▮ used this episode to attack the head of NABU (▮ as incompetent, and introduced an anti-NABU piece of legislation. However, ▮ announced that ▮ arrests had thwarted a joint FBI-NABU investigation into the SMS allowing Iranians to obtain Ukrainian passports. According to public reporting, ▮ and officials from the European Union used this incident (the thwarted investigation) to stop lawmakers from passing the anti-NABU legislation introduced by ▮. ▮ subsequently sent documents related to this incident to Parnas in the spring of 2019, as their efforts to remove ▮ intensified, and his messages evinced a belief that ▮ and ▮ were aligned against ▮.

c. According to an interview with ▮ published in the ▮ on October 1, 2019, ▮ frequently clashed with Ambassador ▮ beginning in as early as 2016. Specifically, ▮ stated that in his first meeting with ▮ in 2016, ▮ snapped at ▮ that "no one is going to dictate to me who is going to be investigated," with respect to ▮ investigations into anti-corruption activists, and that ▮ left the meeting. According to the ▮ article, as ▮ stepped up her criticism of Ukraine's failure to root out corruption, ▮ "personal animus toward ▮ grew," and he became convinced that "he needed to go around her and find a direct path to a more receptive audience: Mr. Trump's inner circle." .

45

41. Based on my participation in the investigation to date, it appears that the initial request to remove ▅▅▅ originated in the spring of 2018. Based on my review of border crossing records, it appears that Parnas was in the United States in early 2018. Fruman, however, traveled to Ukraine in March, April, and May 2018.[18] Around that same time period, Parnas and Fruman started attending political fundraising events and making contributions to congressional candidates and political action committees (including in the name of GEP) with the apparent purpose of enhancing their influence in ▅▅▅ circles, as discussed above.

42. Based on my participation in the investigation as well as my review of materials obtained pursuant to the January 18 Warrant and May 16 Warrant, I have learned that Parnas and Fruman appear to have used their newfound access to seek ▅▅▅ removal. Specifically, I have learned the following:

a. During an April 20, 2018 roundtable at ▅▅▅ sponsored by the ▅▅▅ PAC, Parnas met then-Congressman ▅▅▅ (R-TX), and subsequently scheduled a meeting with ▅▅▅ for May 9, 2018. On May 9, 2018, in Washington, D.C., Parnas had the first of what would be multiple meetings with ▅▅▅. Fruman was in Ukraine at the time, and so Parnas sent him two photographs of the meeting: one depicted Parnas pointing at a map of Ukraine and Eastern Europe while ▅▅▅ looked on, and the other photo depicted ▅▅▅ posing with Parnas.

---

[18] While the exact nature of Fruman's trips—and who he met with—is unknown, based on my review of materials obtained pursuant to the January 18 Warrant and May 16 Warrant, it appears that at least some of those trips were geared towards various business ventures. Based on my participation in the investigation, I have learned that Fruman appears to be an investor in a bar and restaurant in Ukraine, and previously invested in a milk company in Ukraine. Around this time, in the spring of 2018, based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that Fruman began exchanging messages with Parnas regarding energy companies in Ukraine and Poland.

b. It appears that in that first meeting, Parnas discussed with ▇▇▇ the United States Ambassador to Ukraine, ▇▇▇ ▇▇▇, and advocated for her removal from that position. In a letter dated that same day—May 9, 2018—▇▇▇ wrote to Secretary of State ▇▇▇:

> I wanted to bring to your attention an interaction that I recently had with individuals regarding the current U.S. Ambassador to Ukraine. As you likely know, ▇▇▇ ▇▇▇ is the U.S. Ambassador to Ukraine. . . . I have received notice of concrete evidence from close companions that Ambassador ▇▇▇ has spoken privately and repeatedly about her disdain for the current Administration in a way that might call for the expulsion of Ms. ▇▇▇ as U.S. Ambassador to Ukraine immediately. I kindly ask you to consider terminating her ambassadorship and find a replacement as soon as possible.

c. On or about June 15, 2018, a member of ▇▇▇ staff forwarded that letter to Parnas's assistant, who then forwarded it to Parnas and Fruman, and noted, "Please don't distribute, this is only for your records." Parnas had multiple other meetings with ▇▇▇ in May and June 2018. It also appears that on May 9, 2018, or at one of the subsequent meetings, Parnas committed to raising $21,000 for ▇▇▇ reelection campaign. Based on my review of FEC data, I have learned that Fruman and Parnas each subsequently made $2,700 contributions to ▇▇▇ who was running for reelection in November 2018, which were funded by Fruman (and reimbursed later with funds from Muraviev, a Russian national, as discussed above).

d. Parnas's efforts to remove ▇▇▇ continued into July 2018. Based on my review of emails obtained pursuant to the January 18 Warrant and May 16 Warrant, I have learned that around July 6, 2018, Parnas and Fruman traveled to Ukraine and met with then-President ▇▇▇ of Ukraine. Later that month, ▇▇▇ staff arranged a call with the State Department regarding Ambassador ▇▇▇. Prior to that meeting, ▇▇▇ chief of staff asked Parnas if there was anything else he wanted to discuss before she spoke to the State



Department. Despite ▮▮▮ letter and subsequent efforts, Ambassador ▮▮▮ was not removed from her posting at that time.

43. After lobbying ▮▮▮ to remove ▮▮▮ did not on its own succeed, it appears that Parnas soon enlisted Rudolph Giuliani[19] in his efforts to remove ▮▮▮ Based on my review of emails obtained pursuant to the January 18 Warrant and my review of public reporting, I have learned, among other things, the following:

   a. Parnas appeared to have met Giuliani at one of the ▮▮▮ fundraising events Parnas attended in the spring of 2018. In September 2018, Parnas retained Giuliani, through his consulting firm ▮▮▮ LLC, ostensibly to act as a consultant and spokesman for Parnas's fledgling insurance business, Fraud Guarantee. As part of that initial agreement, Giuliani requested a $500,000 retainer and a total $900,000 payment, of which at least the retainer appears to have been paid. However, based on my participation in the investigation and my review of materials obtained pursuant to the January 18 Warrant and May 16 Warrant, it appears that Giuliani's work for Parnas involved, in large part, assisting in the efforts to remove Ambassador ▮▮▮

44. It appears that Giuliani's assistance on the Ambassador issue began in earnest in December 2018. Based on my review of public reporting and materials obtained pursuant to the January 18 Warrant and May 16 Warrant, I have learned, among other things, the following:

---

[19] Based on my review of the January 18 Warrant, I have learned that while Giuliani is an attorney, the parties' contract includes a detailed description of the scope of work to be performed by ▮▮▮ none of which was legal in nature. To the contrary, the terms of the contract expressly state that ▮▮▮ is being retained "as a consultant" and describes a series of non-legal tasks to be completed in that capacity. Based on my participation in the investigation, aside from his statement that Fruman and Parnas were his "clients," described below, it does not appear that Giuliani was ever representing Fruman or Parnas as an attorney at any point.