wire transfer to Parnas was an investment in Fraud Guarantee. Accordingly, it appears that the contributions to the [REDACTED] Fund were made in violation of federal law and as part of the May 16 Warrant Subject Offenses.

Straw Donations to Campaigns and PACs in 2018

19. Based on my review of emails obtained pursuant to the January 18 Warrant, I have learned that in 2017 and 2018, Parnas began receiving fundraising solicitations from PACs supporting [REDACTED] candidates, with a principal focus on the 2018 midterm elections. For instance, Parnas was invited to participate in exclusive events hosted by [REDACTED] (a 501(c)(4) nonprofit entity organized by senior staff members from the Trump Campaign to promote President Trump's policy agenda), [REDACTED] PAC (which describes itself as "the primary super PAC dedicated to electing federal candidates who support the agenda of the Trump-[REDACTED] administration"), and [REDACTED] PAC (which had a stated purpose of working to keep [REDACTED] in control of Congress). Some of those solicitations included invitations to meet with President Trump and high-ranking congressional representatives. Parnas and Igor Fruman attended some of those events together. In order to attend these events, however, Parnas and Igor Fruman were required to, and did, make sizeable political contributions including to [REDACTED] PAC and [REDACTED] PAC. The investigation has revealed that while Igor Fruman financed all of these contributions, some of them were reported in Parnas's name, or in the name of GEP, as described below, a LNG import-export business incorporated by Parnas and Igor Fruman around the time the contributions were made, seemingly in order to obscure the source of the funds and/or evade contribution limitations.

20. Specifically, based on my review of publicly available information, financial records, and emails obtained pursuant to the January 18 Warrant, I have learned the following regarding contributions made by Igor Fruman, Parnas, and GEP:

a. In early February 2018, Parnas was invited to attend the 2018 [redacted] National Committee Spring Retreat at the [redacted] resort in Palm Beach, Florida, scheduled for March 3 through 5, 2018. President Trump was scheduled to be the keynote speaker. Parnas and Igor Fruman both appear to have attended the event and met President Trump. Fruman subsequently stated to a Russian-language newspaper, which has been translated into English, the following regarding the [redacted] event: "In the 2016 election, I made donations to Trump's election campaign fund, and now, a year after taking over the presidency, Trump decided it was right again to invite us and turn to his supporters . . . The meeting in [redacted] was the start of his Campaign in the 2020 election . . . And before that, he set the goal of the [redacted] victory in the mid-term elections to Congress in November 2018."

b. On or about February 23, 2018, [redacted] the director of development for the [redacted] PAC and [redacted] PAC, invited Parnas to attend a [redacted] dinner in New York on or about March 12, 2018, with Vice-President [redacted] and Majority Leader [redacted] In order to attend the event, Parnas was required to make a minimum contribution of $125,000 to [redacted] PAC, with $50,000 contributed before the event. Parnas and Fruman attended the event and on or about March 19, 2018, Fruman made a $50,000 contribution to the PAC in the name "[redacted]." That contribution was transferred to multiple committees, including as a maximum $33,900 contribution to the [redacted]

c. Over the next two months, Parnas and Igor Fruman attended multiple [redacted] events at the invitation of [redacted] For instance, on or about March 26, 2018, [redacted] invited Parnas and Fruman to attend a dinner at [redacted], and on or about March 29, 2018, Parnas, Fruman, [redacted] dined at the resort. The next day, [redacted] emailed Parnas a link to an [redacted] advertisement and the PAC's donor form. Fruman, Parnas, and Parnas's son

appear to have attended another event on or about April 11, 2018. On or about April 20, 2018, Fruman attended at roundtable event at at which President Trump was present, as was Representative a congressman from Texas, and other congressional Representatives. On or about April 23, 2018, sent Parnas the donor form again as well as some more information on .

d. On or April 30, 2018, Igor Fruman and Parnas appear to have attended a dinner at the Trump International Hotel in Washington, D.C., that was affiliated with The next day, on or about May 1, 2018, sent Parnas the contribution form. Parnas responded, "Got it will text you when I send it." On or about May 6, 2018, Parnas's assistant, emailed for wiring instructions for and

e. On or about May 17, 2018, Parnas, with assistance, made a $325,000 contribution, in the name of GEP, to PAC. According to a contribution form signed by Parnas, the contribution came from GEP, of which he was the CEO and co-founder. No other individuals were listed on the contribution form. The contribution form required Parnas to affirm that "[t]his contribution is made from the funds of the above-listed donor, will not be reimbursed by another, and if this contribution is made via credit card, it is being made with a card for which the donor has a legal obligation to pay and will not be made on the card of another."

f. On or about May 31, 2018, emailed and asked whether "Lev could complete the last $75k to which was a reference to the fact that Parnas committed to contribute $125,000 to to attend the March 12, 2018 dinner in New York, but Fruman had only paid $50,000. On or about June 12, 2018, Igor Fruman made

another $50,000 contribution to [redacted] PAC, and on June 29, 2018, Parnas made an $11,000 contribution to the [redacted] PAC.

g. As noted above, on or about April 20, 2018, Parnas met Representative [redacted] at [redacted] On or about April 22, 2018, [redacted] contacted Representative [redacted] staff to request a meeting on behalf of Parnas; a dinner was scheduled for April 26, 2018, but then canceled. Parnas met Representative [redacted] at his office in Washington, D.C., on or about May 9, 2018. On or about June 6, 2018, Parnas met with Representative [redacted] again at his office. On June 7, 2018, [redacted] wrote [redacted] staff to report that she had "just spoke to Lev [Parnas] about how we can help out by using our contacts for Congressman [redacted]." [redacted] later explained that she had an "initial list of donors" who would make a donation of $21,000 on one credit card. [redacted] staff explained the applicable campaign finance regulations and said she was unsure if "we can do that entire amount on one credit card but I can find out." Parnas appears to have again met Representative [redacted] on June 14, 2018. On June 25, 2018, Parnas and Igor Fruman each made $2,700 contributions to Representative [redacted] who was running for reelection in November 2018. They listed GEP as their employer.

21. Based on my review of financial records, it appears that the contributions to [redacted] PAC and Representative [redacted] that were made in Parnas's name were, in fact, funded by Igor Fruman, in violation of certain of the Subject Offenses. Additionally, it appears that the contribution to [redacted] PAC, which was made in the name of GEP, was actually funded not by GEP, but rather through a private loan from third parties to Igor Fruman and his brother, [redacted] having nothing to do with GEP, in violation of certain of the Subject Offenses. Specifically, from my review of financial records and emails obtained pursuant to the January 18 Warrant, I have learned the following:

a. On or about on May 15, 2018, Igor and [redacted] obtained a $3 million commercial loan from [redacted], a businessman in Florida, and [redacted], an attorney in New Jersey. The loan was initiated by Correia, who had reached out to a commercial mortgage broker, who in turn identified [redacted] as private lenders. Under the terms of a mortgage agreement, dated May 15, 2018, [redacted] lent the money to [redacted] LLC (which is owned by Igor and [redacted]) and secured a mortgage on a condominium in Bal Harbour, Florida, which is owned by [redacted].

b. On or about May 15, 2018, $1,260,329.80 of the money lent to Igor and [redacted] was transferred from [redacted] to a bank account in the name of [redacted] (the [redacted] Account"), on which Parnas was a signer (but neither Igor nor [redacted] was). Prior to receiving that transfer, the [redacted] Account generally had a low balance and minimal account activity. For instance, in January 2018, the [redacted] Account had a beginning balance of $0.84, and in February 2018 it had a beginning balance of $66.79. Using the funds that had been transferred into the [redacted] Account two days prior, on or about May 17, 2018, Parnas, with [redacted]'s assistance, wired $325,000 to [redacted] PAC. As described above, Parnas told [redacted] to report the contribution as coming from GEP. However, as detailed herein, the funds did not come from GEP, but rather from a private lending transaction between a property management company run by Parnas and Igor Fruman and third party lenders.

c. On or about May 22, 2018, $100,000 was transferred from the [redacted] Account to an account in the name of Global Energy Producers LLC. The funds used to make that transfer originated from the funds from the [redacted] loan to [redacted] and Igor Fruman.

The Global Energy Producers LLC account, which had little money in it prior to the transfer, was used to make the $11,000 contribution to the [REDACTED] PAC in Parnas's name.

d. Additionally, Parnas's June 25, 2018 contribution to Representative [REDACTED] was paid for using an [REDACTED] account held in the name of [REDACTED] (registered signer, [REDACTED] using a card in Igor Fruman's name — which was the same account that was used to make Fruman's contribution to [REDACTED] PAC and Representative [REDACTED].

e. On or about May 3, 2018, [REDACTED] assisted Parnas with making a $15,000 donation in GEP's name to [REDACTED] PAC. However, this donation does not appear to have come from GEP. Rather, [REDACTED] used an [REDACTED] card held in Igor Fruman's name, which drew on an account held in the name of "[REDACTED] - [REDACTED] – which appears to be a credit card account associated with Igor and [REDACTED]s business – to make the donation.

22. Based on my review of email correspondence obtained pursuant to the January 18 Warrant, financial records, and public sources, it appears that Igor Fruman's funds were intentionally funneled through GEP, which had been created shortly before the contribution to [REDACTED] PAC was made, for the purpose of making a contribution that evades campaign finance reporting requirements. Specifically:

a. GEP was incorporated in Delaware on or about April 11, 2018, as a single-member LLC with [REDACTED] as its registered agent. Neither Igor Fruman nor Parnas was originally registered as an agent of GEP, nor was either of them named in any initial filing in Delaware relating to the LLC at the time the GEP donations were made. Fruman, in fact, was not named as a member of the LLC in any public filing until sometime in June or July of 2018. Parnas has historically made extensive use of various corporate entities in Florida, and it appears for many

of those entities, Parnas has registered those companies in his own name and/or is listed as an officer or agent.

b. On April 18, 2018, Fruman, Parnas, and Correia created new email accounts with GEP domains and in May 2018 they opened GEP bank accounts. However, while GEP purported to be an LNG business, there is no record of it importing or exporting gas. Specifically, based on a review of U.S. Department of Energy records, it does not appear that GEP has, or ever has had, a permit to engage in shipping of LNG. From a review of bank records, it does not appear that the company generated any revenue, had any natural gas assets, or generated any type of income, and that the vast majority of the incoming funds to GEP were from transfers from other bank accounts controlled by Parnas or Fruman.[5]

23. Based on my review of FEC records and donor forms that were attached to emails obtained pursuant to the January 18 Warrant, I have learned that, on or about June 25, 2019, Igor Fruman made a $2,700 contribution to Representative [REDACTED] – the maximum contribution permitted by law – and therefore was not legally permitted to contribute the additional $2,700 that was donated in Parnas's name. Additionally, I have learned that [REDACTED] is a joint fundraising entity and contributions made to it are distributed to designated campaigns and PACs in a manner disclosed to donors on contribution forms. Specifically, the [REDACTED]

[5] Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that on or about July 9, 2018, Correia texted Parnas a copy of a non-disclosure agreement ("NDA") between GEP and [REDACTED] and asked for Parnas' approval. Corriea also emailed copies to [REDACTED] on the same date. According to the NDA, GEP and [REDACTED] wished to "explore a business possibility," and was signed by Fruman but not by [REDACTED] Based on my review of publicly available materials, it appears that [REDACTED] may be associated with a Polish energy company. However, based on my review of materials obtained pursuant to the January 18 and May 16 Warrants, and a review of bank records, it does not appear that GEP actually did any business [REDACTED] or had any communications after July 15, 2018. In addition, it appears that in early 2019, Parnas, Fruman, and Correia made efforts to engage in LNG business in GEP's name, but it appears that those efforts did not result in actual business.




contribution form stated that contributions by individuals would be given in priority order to: Committee (up to $5,000), for Congress (up to $2,700), the (up to $33,900), and then to specifically designated campaigns. Accordingly, it appears that when Igor Fruman contributed $50,000 in March 2018 to (as discussed below, in the name " his funds were used to make maximum contributions to the and Committee. When Parnas subsequently contributed $11,000 in June 2018 to those funds were used to make maximum contributions to Committee and for Congress, as well as a $3,300 contribution to Thus, it appears that by making the $11,000 contribution in Parnas's name, Igor Fruman illegally funded two maximum contributions to Committee and exceeded the contribution limit to the

24. Based on my review of public sources and emails obtained pursuant to the January 18 Warrant, it appears that when the press started reporting about GEP, and an FEC complaint was filed about GEP, Correia, Parnas, and Igor Fruman made statements – many of which appear to be false – relating to GEP's operations, which is indicative of the fact that GEP appeared to be set up initially for the primary purpose of making a contribution. Specifically:

a. On or about July 17, 2018, the asked for comment on a story relating to Global Energy Producers. Forwarding an email from a reporter, an advisor/consultant wrote to Parnas and Correia, "This is what happens when you become visible. The buzzards descend." Parnas responded, "That's why we need to stay under the radar and have the best lawyers."

b. On or about July 23, 2018, published an article about LLC donations to which mentioned the contribution by GEP. The following day, on or about July 24, 2018, a reporter for emailed Parnas about GEP. Parnas did not respond,



and on or about July 25, 2018, [redacted] published an article suggesting that GEP was a mere shell company used to make a contribution to the PAC. On the same day, the [redacted] filed a complaint with the FEC about the contribution.

c. On or about July 28, 2018, Correia emailed a publicist about the allegations in the articles and complaint. Among other things, Correia claimed that "we have hundreds of emails both internally and to third parties with respect to the sourcing of LNG, logistics and shipping of the products internationally as well as communications, MOU's and contracts in draft form with multiple buyers." But from my review of emails from [redacted] and personal email accounts obtained pursuant to the January 18 Warrant, it appears that a large portion of the activity relating to GEP concerned incorporating the entity, opening bank accounts, creating a logo, and making political contributions, and very few, if any, emails to that point related to the subjects Correia raised with the publicist in his July 28 email. Additionally, Correia wrote to the publicist that the contribution to [redacted] was funded through "a significant amount [of] capital [that] was brought into the company to fund its initial operations . . . all of which was funded by Lev [Parnas] and Igor [Fruman] personally." But, as described above, all of the money that went into GEP, at least initially, came from the [redacted] loan to [redacted].

d. On or about October 11, 2018, GEP, Igor Fruman, and Parnas filed with the FEC a response to the [redacted]'s FEC complaint. Attached to the response were sworn affidavits by Parnas, Fruman, and Correia. According to Parnas and Fruman's affidavits, Global Energy Producers "is a real business enterprise funded with substantial bona fide capital investments," "its major purpose is energy trading, not political activity," and the [redacted] PAC contribution "was made with GEP funds for GEP purposes." Additionally, Parnas stated in his affidavit that his contribution to [redacted] for Congress "was made with a business

credit card . . . which [he] reimbursed." These statements to the FEC, and GEP's filed response to the FEC, appear to be false, in violation of the May 16 Warrant Subject Offenses and the Subject Offenses. As set forth above, the [REDACTED] PAC contribution was made with funds from a third party private loan to an entity run by Igor and [REDACTED] that were moved through multiple bank accounts – none belonging to GEP – before being paid to [REDACTED] PAC by the [REDACTED] Account. Additionally, based on my review of work product provided by a financial analyst who has reviewed bank accounts belonging to Igor Fruman, Parnas, and [REDACTED] [REDACTED] the analyst found no evidence of reimbursement by Parnas to [REDACTED] or [REDACTED] for the contributions to Congressman [REDACTED]

e. Parnas and Igor Fruman appear to have had incentives to hide their assets or access to funding at the time they were making multi-hundred thousand dollar political donations. Based on my review of publicly-available information, I have learned that in or about 2011, Parnas was sued by a former investor in a failed film project Parnas pursued. In 2015, a federal court awarded the investor judgment in excess of $500,000, which has not been paid, and the investor subsequently commenced post-judgment discovery in search of Parnas's assets. In fact, based on my review of public reporting, I have learned that since the press reported about Parnas's involvement with GEP, the investor has engaged in litigation related to Parnas' relationship to the GEP donations in an effort to collect on the outstanding judgement. Similarly, based on my review of materials obtained pursuant to the January 18 Warrant, I am aware that in 2018, Igor Fruman was undergoing divorce proceedings, and that in early June 2018, Fruman received a lengthy discovery request pursuant to his divorce proceedings, with the goal "to show the source of [Igor's] funds" to purchase various properties.

25. Based on my review of financial records for a bank account held in the name of at for which is an authorized signatory (the "), I have learned that on September 19, 2018 – the day after the received a wire transfer from Andrey Muraviev in the amount of $500,000, as discussed below – the was used to pay the bill in the amount of $494,415.21. That bill included Igor Fruman's donations to the Fund, PAC, for Congress, and Parnas' and Igor Fruman's donations to among other donations.

26. Based on the foregoing, it appears that the contributions to PAC and Representative were funded by Igor Fruman, but were made in the name of Parnas in violation of certain of the May 16 Warrant Subject Offenses. In addition, it appears that the contributions made in the name of GEP to PAC and PAC were unlawful straw donations made in the name of GEP to disguise the source of the funds, in violation of certain of the May 16 Warrant Subject Offenses.

<u>Unlawful Contributions by Fruman in a False Name</u>

27. It appears that Fruman made multiple contributions, using another person's name and identity, in the name " and listed an incorrect employer in order to disguise the true donor of the contributed funds and potentially conceal assets from others, including creditors. Specifically, based on my review of FEC records, financial records, emails obtained pursuant to the January 18 Warrant, public sources, and my training and experience, I have learned the following:

a. On or about March 19, 2018, as noted above, Fruman made a $50,000 contribution to PAC. The contribution was reported to the FEC as coming from