41. Based on my participation in the investigation to date, it appears that the initial request to remove [REDACTED] originated in the spring of 2018. Based on my review of border crossing records, it appears that Parnas was in the United States in early 2018. Fruman, however, traveled to Ukraine in March, April, and May 2018.[18] Around that same time period, Parnas and Fruman started attending political fundraising events and making contributions to congressional candidates and political action committees (including in the name of GEP) with the apparent purpose of enhancing their influence in [REDACTED] circles, as discussed above.

42. Based on my participation in the investigation as well as my review of materials obtained pursuant to the January 18 Warrant and May 16 Warrant, I have learned that Parnas and Fruman appear to have used their newfound access to seek [REDACTED]s removal. Specifically, I have learned the following:

a. During an April 20, 2018 roundtable at [REDACTED] sponsored by the [REDACTED] PAC, Parnas met then-Congressman [REDACTED] (R-TX), and subsequently scheduled a meeting with [REDACTED] for May 9, 2018. On May 9, 2018, in Washington, D.C., Parnas had the first of what would be multiple meetings with [REDACTED] Fruman was in Ukraine at the time, and so Parnas sent him two photographs of the meeting: one depicted Parnas pointing at a map of Ukraine and Eastern Europe while [REDACTED] looked on, and the other photo depicted [REDACTED] posing with Parnas.

[18] While the exact nature of Fruman's trips—and who he met with—is unknown, based on my review of materials obtained pursuant to the January 18 Warrant and May 16 Warrant, it appears that at least some of those trips were geared towards various business ventures. Based on my participation in the investigation, I have learned that Fruman appears to be an investor in a bar and restaurant in Ukraine, and previously invested in a milk company in Ukraine. Around this time, in the spring of 2018, based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that Fruman began exchanging messages with Parnas regarding energy companies in Ukraine and Poland.



b. It appears that in that first meeting, Parnas discussed with [REDACTED] the United States Ambassador to Ukraine, [REDACTED] and advocated for her removal from that position. In a letter dated that same day—May 9, 2018—[REDACTED] wrote to Secretary of State Michael [REDACTED]:

> I wanted to bring to your attention an interaction that I recently had with individuals regarding the current U.S. Ambassador to Ukraine. As you likely know, [REDACTED] is the U.S. Ambassador to Ukraine. . . . I have received notice of concrete evidence from close companions that Ambassador [REDACTED] has spoken privately and repeatedly about her disdain for the current Administration in a way that might call for the expulsion of Ms. [REDACTED] as U.S. Ambassador to Ukraine immediately. I kindly ask you to consider terminating her ambassadorship and find a replacement as soon as possible.

c. On or about June 15, 2018, a member of [REDACTED] staff forwarded that letter to Parnas's assistant, who then forwarded it to Parnas and Fruman, and noted, "Please don't distribute, this is only for your records." Parnas had multiple other meetings with [REDACTED] in May and June 2018. It also appears that on May 9, 2018, or at one of the subsequent meetings, Parnas committed to raising $21,000 for [REDACTED] reelection campaign. Based on my review of FEC data, I have learned that Fruman and Parnas each subsequently made $2,700 contributions to [REDACTED] who was running for reelection in November 2018, which were funded by Fruman (and reimbursed later with funds from Muraviev, a Russian national, as discussed above).

d. Parnas's efforts to remove [REDACTED] continued into July 2018. Based on my review of emails obtained pursuant to the January 18 Warrant and May 16 Warrant, I have learned that around July 6, 2018, Parnas and Fruman traveled to Ukraine and met with then-President [REDACTED] of Ukraine. Later that month, [REDACTED] staff arranged a call with the State Department regarding Ambassador [REDACTED] Prior to that meeting, [REDACTED] chief of staff asked Parnas if there was anything else he wanted to discuss before she spoke to the State

Department. Despite [REDACTED] letter and subsequent efforts, Ambassador [REDACTED] was not removed from her posting at that time.

43. After lobbying [REDACTED] to remove [REDACTED] did not on its own succeed, it appears that Parnas soon enlisted Rudolph Giuliani[19] in his efforts to remove [REDACTED]. Based on my review of emails obtained pursuant to the January 18 Warrant and my review of public reporting, I have learned, among other things, the following:

a. Parnas appeared to have met Giuliani at one of the [REDACTED] fundraising events Parnas attended in the spring of 2018. In September 2018, Parnas retained Giuliani, through his consulting firm [REDACTED] LLC, ostensibly to act as a consultant and spokesman for Parnas's fledgling insurance business, Fraud Guarantee. As part of that initial agreement, Giuliani requested a $500,000 retainer and a total $900,000 payment, of which at least the retainer appears to have been paid. However, based on my participation in the investigation and my review of materials obtained pursuant to the January 18 Warrant and May 16 Warrant, it appears that Giuliani's work for Parnas involved, in large part, assisting in the efforts to remove Ambassador [REDACTED]

44. It appears that Giuliani's assistance on the Ambassador issue began in earnest in December 2018. Based on my review of public reporting and materials obtained pursuant to the January 18 Warrant and May 16 Warrant, I have learned, among other things, the following:

---

[19] Based on my review of the January 18 Warrant, I have learned that while Giuliani is an attorney, the parties' contract includes a detailed description of the scope of work to be performed by [REDACTED], none of which was legal in nature. To the contrary, the terms of the contract expressly state that [REDACTED] [REDACTED] is being retained "as a consultant" and describes a series of non-legal tasks to be completed in that capacity. Based on my participation in the investigation, aside from his statement that Fruman and Parnas were his "clients," described below, it does not appear that Giuliani was ever representing Fruman or Parnas as an attorney at any point.



a. On December 7, 2018, Parnas forwarded Giuliani a copy of the May 9, 2018 letter.

b. In January 2019, Giuliani and Parnas met with at in New York. A memorandum regarding the meeting, which appears to have been subsequently provided to the State Department by Giuliani,[20] indicates that they discussed Ambassador who asserted "protects" the "ineffective" Specialized Anticorruption Prosecutor's Office in Ukraine – an apparent reference to NABU and – and who claimed asked him to close three cases, including a case against the member of Ukraine's Parliament who was involved in the disclosure of -related information. According to the memorandum, also reported that he had re-initiated an investigation his predecessor, , had opened into , in which a board member, was implicated.

c. Around the same time, also according to a memorandum which appears to have been provided to the State Department by Giuliani, Parnas and Giuliani participated in a phone interview of (the former Prosecutor General), who provided information about his

[20] Based on my participation in the investigation, I have learned that according to a U.S. Department of State Office of Inspector General investigation, in late March or early April 2019, Secretary of State received a package that had to do with "Ukraine issues." The package had a return label of "The White House," although it bore no official seal, and contained notes from interviews between Parnas, Fruman, and Giuliani, among others, with and dated January 23, 2019, regarding . The documents were separated into folders that bore the insignia of the Trump Hotel. The notes from the meeting with include his allegation about the "do not prosecute list," discussed below, and his explanation that the heads of SAPO and NABU "do not like each other" and that the head of NABU favored over Trump, and that spends money on "good public relations" for NABU. The package then contained March 20, 2019 articles (discussed below) featuring his interview with along with documents that appeared to be notes and emails regarding the articles. On October 2, 2019, Giuliani confirmed to that the package originated with him, and that he gave the documents to the White House, which then passed them to . Giuliani claimed that told him that would refer the documents for an investigation.

investigation and claimed that President [REDACTED] had put an end to the investigation at the request of then-Vice-President [REDACTED].

45. Based on my review of U.S. border crossing records, materials obtained pursuant to the May 16 Warrant, and public reporting, it appears that on February 11, 2019, Parnas and Giuliani again met with [REDACTED] this time in Warsaw, Poland. Based on my review of materials obtained from the May 16 Warrant, I have learned that in February 2019, [REDACTED], an attorney and the spouse of former Washington D.C. United States Attorney [REDACTED] appears to have become involved in the effort to remove Ambassador [REDACTED] On multiple occasions, she asked Parnas if Giuliani had completed drafting a retainer agreement, noting in one instance that "[o]ur hands are pretty tied about doing much until we have it in place as we need it for FARA." Texts messages suggest that Giuliani was preparing a retainer agreement, and Parnas stated in one message that the retainer should be between [REDACTED] and the Ministry of Justice of Ukraine (Attn: [REDACTED]).

46. Based on my review of materials obtained from the May 16 Warrant, I have learned that on or about February 16, 2019, Giuliani sent Parnas and Fruman a draft retainer agreement between "[REDACTED] as the General Prosecutor of Ukraine," and [REDACTED] and [REDACTED][21] The retainer amount was $200,000 for services by Giuliani, [REDACTED], and [REDACTED] in recovering "sums of money in various financial institutions outside Ukraine." It is not clear what this phrase refers to, and may simply have been an effort to legitimize, or give the

---

[21] Based on my review of materials obtained pursuant to the May 16 Warrant, it is not clear whether Parnas or Giuliani forwarded a copy of the February 2019 draft retainer agreement to [REDACTED] Around that time, [REDACTED] repeatedly asked Parnas what the status of the retainer agreement was, and asked him to forward her a copy. Parnas responded that he was trying but it was not going through, although it is not clear whether Parnas ultimately succeeded in forwarding the draft retainer to [REDACTED]

appearance of legitimacy to, what were in truth their efforts to remove the U.S. ambassador to Ukraine. The agreement also stated that it was a temporary agreement to be superseded "by a long term agreement." On February 20, 2019, Parnas asked Giuliani to send wire instructions and a "signed copy by you [REDACTED] so they can execute and wire funds." Later that day, Parnas confirmed that he "received signed retainer," however, we have not obtained a copy of the signed retainer. As discussed below, drafts of three long-form retainer agreements between [REDACTED] & [REDACTED] and (i) [REDACTED] (ii) [REDACTED] [REDACTED][22] and (iii) [REDACTED] and [REDACTED] separately – all of which were signed by [REDACTED] – were subsequently circulated in April 2019. Based on my review of Department of Justice records related to FARA filings, I have learned that none of Parnas, Fruman, Giuliani, [REDACTED] or [REDACTED] registered under FARA at any point in 2018 or 2019.

47. Based on my review of materials obtained from the May 16 Warrant, I have learned that after Giuliani received payments from Parnas, Giuliani appeared to have privately lobbied high-level officials—including, apparently, Secretary of State [REDACTED] and President Trump—for the removal of Ambassador [REDACTED] On February 11, 2019, the same day that Giuliani and Parnas met with [REDACTED] [REDACTED] asked Parnas and Giuliani in a text message "Is there absolute commitment for HER to be gone this week?" Giuliani replied, "Yes not su[r]e how absolute [w]ill get a reading in morning and call you. [REDACTED] is now aware of it. Talked to him on Friday." On February 14, 2019, [REDACTED] asked Parnas if he had heard from Giuliani, and Parnas said he had, and encouraged [REDACTED] to "nudge [Giuliani] about the Mrs. A.," which appears to be a

[22] Based on my review of publicly available material, I have learned that [REDACTED] worked under [REDACTED] at that time as the deputy head of International Legal Cooperation. According to an article published on October 5, 2019 in the [REDACTED], [REDACTED] asked [REDACTED] to remove [REDACTED] at a meeting in 2016 due to [REDACTED]s corruption.



reference to Ambassador  On February 16, 2019, Parnas texted  that he "really need[ed] to know [the] status of madam A. [w]hile I'm here." It appears Parnas was in Ukraine at the time.  responded, "That's for Rudy to get tonight." The next day,  asked Parnas if Giuliani "meet with the guy re Amb?" to which Parnas replied, "I am still waiting on that[, m]eeting with big guy in 4 hours," an apparent reference to President Trump. Later that day,  asked "Was he successful re Amb?" to which Parnas replied "this week."

48. Based on my review of materials obtained from the May 16 Warrant, public reporting and U.S. border crossing records, I have learned that shortly after Giuliani's lobbying efforts, Parnas traveled to Ukraine in late February and met with  On February 21, 2019, Giuliani texted Parnas, "How is it going????" to which Parnas replied, "Meeting with  ] now everything good." Three days later, Giuliani again asked how things were going, and Parnas explained that he was "meeting with  in 2 hours he has some paperwork to give us I'll call you after the meeting." It is currently unclear whether these meetings between Parnas and  regarded  desire to have the Ambassador removed; Giuliani's desire for information about  and  or both; or another topic. Nonetheless, as reflected in text messages below, it does appear that Parnas's efforts to have Ambassador  removed were done at the request of .

49. Based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned that following Parnas's meeting with  in February 2019, and given that Giuliani's lobbying efforts appeared to have failed, Parnas, , Giuliani, and  worked with a journalist,  at , to mount an aggressive public media campaign to remove  Their media campaign began within days of



complaining to Parnas about actions that [REDACTED] had taken in Ukraine against an ally of [REDACTED]'s. Specifically, I have learned the following:

50. According to articles published on March 6, 2019, [REDACTED] gave a speech in which she called for [REDACTED]'s removal from SAPO. As discussed above, NABU had previously called for the removal of [REDACTED] (who, according to public reporting, was an ally of [REDACTED] and [REDACTED] and claimed that [REDACTED] had leaked information about corruption cases to corruption targets; yet a year later, [REDACTED] was still in his position. [REDACTED] also criticized the Ukrainian court system, which she described as riddled with compromised judges.

51. Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that [REDACTED] immediately complained about [REDACTED] statements to Parnas. Specifically, on March 5, 2019 (which appears to be the day [REDACTED] speech, which was not reported until the following day), [REDACTED] texted Parnas "Ambassador openly called to fire head of the SAPO," which was a reference to [REDACTED]. Parnas asked [REDACTED] to call him, and [REDACTED] reported that the Ambassador had also criticized Ukrainian Supreme Court judges.

52. Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that in response to [REDACTED] complaint, on March 8, 2019, Parnas sent [REDACTED] a photograph of [REDACTED] letter, and she replied by sending the contact information for [REDACTED] [REDACTED] a reporter at [REDACTED]. That same day, according to text messages, it appears that Parnas, [REDACTED] and [REDACTED] met with [REDACTED] about Ambassador [REDACTED] and the next day Parnas sent [REDACTED] information about the Ambassador. Specifically, I have learned the following:



a. wrote Parnas again on March 8, 2019, and referred to a statement made in which she called for removal; Parnas replied "we are all in the loop," and wrote to confirm that they were setting up an interview with and a journalist ( as discussed below). then sent Parnas the contact info for and wrote: " [ is waiting I explained everything. Ready to talk about the l[a]ck of impartiality." Parnas and discussed setting up an interview between and but told Parnas that could not answer questions about "the Ambassador, in the "middle of the campaign." Based on my review of public reporting, I have learned that at the time, was running for re-election, which he would ultimately lose.

b. appeared to grow impatient with Parnas's failure to secure removal. On March 11, 2019, asked Parnas when he would be receiving an invitation from the "General Attorney," which appears to be a reference to the U.S. Attorney General. On March 13, 2019, wrote Parnas "I am fucking sick of everything. I did not get the visit. My First did not get shit. I am ready to screw your opponents. But you want even more. We – everything. You – later. This is not fair." Based on my participation in the investigation, this appears to be a reference to and others' willingness to share information about and and frustration that Parnas could not similarly deliver on issues to include the removal of Ambassador and meeting with the Attorney General. On March 14, 2019, Parnas responded "I just spoke with our [people]. I think there is good news. When you get a chance, call me regarding your visit here." Based on my participation in the investigation, it appears that "our people" refers to Giuliani and/or



c. Parnas, and continued to work together to publicize allegations through . A few days later, on March 12, 2019, Parnas received from a written narrative and answers to questions posed by about Vice-President and Parnas forwarded answers to Around that time, Parnas also spoke to and conveyed additional information back to indicated that he needed President and "on the record about the ambassador and and so Parnas set up an interview between and

d. Based on my review of public reporting, I have learned that on March 20, 2019, a portion of video interview and an accompanying article entitled "Senior Ukrainian Official Says He's Opened Probe into US Election Interference" were published in . In his interview, claimed he would open an investigation into whether the director of NABU, attempted to "influence the 2016 vote to the benefit of Democratic presidential nominee In a second video interview published on March 20, 2019, by in , told that Ambassador had given him "a list of people whom we should not prosecute" during their first in-person meeting in or about January 2017. reported that was not "the only person complaining about the U.S. Embassy in Kiev," and noted that Congressman wrote a "private letter asking Secretary of State to recall the current U.S. ambassador, alleging that she made disparaging statements about President Trump." also posted a copy of the letter. The article quoted as describing allegations as untrue and an "absurd attempt" to discredit NABU.

53. Based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned that Parnas continued working to publicize allegations against



[redacted] and texted links to [redacted] articles to many of his contacts. Specifically, I have learned the following:

a. On March 20, 2019, Parnas sent [redacted] the development director of [redacted] PAC (to whom Parnas had previously donated in the name of GEP) links to both of [redacted] articles in [redacted], along with links to tweets by [redacted]. Parnas instructed [redacted] "have [redacted] retweet it," an apparent reference to [redacted] confirmed "sent." As discussed below, [redacted] retweeted a related article several days later. However, President Trump retweeted one of the links that Parnas sent to [redacted] that same day, on March 20, 2019: an article entitled "As Russia Collusion fades, Ukrainian plot to help [redacted] emerges." [redacted] then sent a copy of President Trump's tweet to Parnas.

b. Parnas frequently updated [redacted] on the success of their March 20, 2019 press blitz. Parnas promptly sent a screenshot of President Trump's tweet to [redacted]. In an apparent effort to garner more information for [redacted] Parnas asked [redacted] to send him "the names of the people that she said," which appears to be a reference to [redacted]s claimed "do not prosecute list." [redacted] sent Parnas three names ("[redacted] MP, [redacted] MP, [redacted] ngo") and described them all as "loud NABU activist[s]." As discussed above, based on public reporting, it appears that [redacted] may have clashed with [redacted] regarding NABU in the spring of 2018, and was frustrated by her continued alignment with NABU, which appears to have provided a motive for [redacted] to claim that [redacted] had asked him not to prosecute "loud NABU activist[s]." Parnas congratulated [redacted] and told him that "Today you become a world-class political figure. Glory to the Ukraine !!!" [redacted] then asked Parnas if it was "true, that the Ambassador chick and [redacted] [sic] were called to Washington," which appears to be a reference to [redacted] and [redacted] the head of NABU, to which Parnas replied, "I will call later. We'll